837 A.2d 359

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. SALVATORE GOLOTTA, DEFENDANT–
RESPONDENT.

Argued November 3, 2003—Decided December 16, 2003.

206

208

*James L. McConnell,* Assistant Prosecutor, argued the cause for appellant (*Wayne J. Forrest,* Somerset County Prosecutor, attorney).

*Leonard Meyerson,* argued the cause for respondent (*Miller, Meyerson, Schwartz & Corbo,* attorneys; *Mr. Meyerson* and *David H. Baskind,* of counsel, *Mr. Baskind,* on the briefs).

*Steven J. Zweig,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Peter C. Harvey,* Attorney General, attorney).

Justice VERNIERO delivered the opinion of the Court.

In this search-and-seizure case, a cell-phone user telephoned a 9-1-1 operator to report that a particular motor vehicle was being driven erratically on a public road. The question presented is whether that call and the information that it imparted provided a constitutional basis for the police to stop the identified vehicle. Given the significant risk of death or serious injury to the public and to the vehicle's driver implicated by such a call, and in view of the other factors discussed below, we hold that the answer to that question is yes.

I.

These are the pertinent facts as developed at the suppression hearing before the municipal court. On November 5, 2000, at about 9:30 p.m., two officers of the Peapack–Gladstone police department, each driving a separate police cruiser, received a message from a communications center in Somerville. The center's dispatcher relayed to the officers that the center had received a call from "a citizen informant" using a cell phone. According to the one officer who testified, the citizen called to report that a person in a certain vehicle was driving erratically. The officer was informed that the vehicle was "all over the road" and "out of control. It was weaving back and forth."

The caller also described the vehicle as a blue pickup truck with the license plate number, VM–407B, and indicated that it was traveling northbound on Route 206. At the suppression hearing the officer was asked whether the dispatcher disclosed the caller's name or "whether or not a name was obtained[.]" The officer answered that "[a] name was not obtained." The officer further indicated "that [the caller] did not want to file a charge or a

complaint ... [a]nd did not want to be involved. [The caller] merely wanted to report that this [erratic driving] was occurring."

When the officer received that information, he was traveling westbound on Pottersville Road close to where the road intersects with Route 206. The officer explained, "I approached 206 at the crest of the hill. At the traffic light, as I approached, I witnessed ... a blue pick-up truck pass in front of me." (The officer later indicated that he had not observed "any movements of the vehicle whatsoever." The officer made that statement in response to the question, "Can you describe what the vehicle was doing?" Viewing the testimony in context, we understand it to mean that the officer did not see any *erratic* movements, but did observe the vehicle pass in front of him.) He and the other officer, who was traveling northbound on 206, quickly moved behind the vehicle, and they "initiated the stop at the same time."

The vehicle matched the description given by the caller, except that the last letter of the license plate number was "V" rather than "B." As already indicated, because the testifying officer immediately initiated the stop once he had located the vehicle, he did not notice whether it was being driven improperly. The officer stated that he "was only behind the vehicle for a matter of four to five seconds before [he and the other officer] effected ... the stop."

Subsequent to the stop, the driver, later identified as defendant Salvatore Golotta, submitted to a breathalyzer test, and was charged with driving while intoxicated (DWI) under *N.J.S.A.* 39:4–50. Defendant moved before the municipal court to suppress the breathalyzer results. He argued that, by not observing the alleged erratic driving, the officer had lacked sufficient suspicion to stop the vehicle and, as a result, any evidence gathered after that juncture was inadmissible. Given that position, the suppression hearing focused solely on whether the police were justified in stopping the vehicle and not on any aspect of their conduct that followed the stop. The municipal court denied defendant's motion. Thereafter, defendant entered a guilty plea to the DWI offense

conditioned on his right to appeal the denial of his suppression motion.

Defendant appealed to the Law Division. Following its *de novo* review of the record, the trial court noted that the officer had stopped defendant's vehicle on the basis of the anonymous tip and without himself observing any suspicious conduct. Consistent with its view of the relevant case law, the trial court held that there was an insufficient basis contained in the record to justify the stop and, therefore, that the breathalyzer results must be suppressed.

After granting the State's motion for leave to appeal, the Appellate Division affirmed in a reported opinion. *State v. Golotta,* 354 *N.J.Super.* 477, 808 *A.*2d 135 (2002). The panel agreed with the Law Division that the police had not adequately corroborated or verified the anonymous tip and, accordingly, the officers had not formed "a reasonable articulable suspicion of quasi-criminal activity to justify the stop of defendant." *Id.* at 483, 808 *A.*2d at 138. We granted the State's motion for leave to appeal, 176 *N.J.* 70, 819 *A.*2d 1186 (2003), and also granted *amicus curiae* status to the Attorney General.

## II.

■ Prior to oral argument before this Court, the Attorney General moved to submit the fact that the informant in this case was not anonymous but in reality had given his name to the 9–1–1 operator at the time of the call. As support, the Attorney General has provided a written abstract generated by a computer-aided dispatch system that purportedly contains the precise date and time of the call, the caller's name, and other relevant information. Defendant strongly objects to that submission, contending that we should not "re-write the [t]rial [r]ecord" at this belated juncture in the proceedings.

We agree with defendant insofar as the caller's identity is concerned. We recently explained that, as a general rule within a suppression context, "the State on appeal cannot rely on factual

testimony or other proof that was not submitted as part of the lower court's record." *State v. Wilson*, 178 *N.J.* 7, 14, 833 *A.*2d 1087, 1091 (2003). It would be inconsistent with appellate practice for us to accept the proffered information here, especially in view of the fact that the State had ample opportunity two years ago to present it at the proper forum, namely, at the original suppression hearing. Thus, we will continue to treat and analyze this case as if the informant had not offered or identified his name to the police.

The Attorney General's brief and motion papers contain other information that generally describes the 9–1–1 system that is utilized in Somerset County and elsewhere in the State. We accept that generic information, which is akin to our taking judicial notice of it, for the limited purpose of assisting the Court in understanding how the 9–1–1 system operates in this setting. See *id.* at 17, 833 *A.*2d at 1093 (instructing in search-and-seizure case that appellate courts "can infer or take judicial notice of certain facts in appropriate circumstances"); *State v. Garthe*, 145 *N.J.* 1, 12, 678 *A.*2d 153, 158 (1996) (taking judicial notice of similarity of procedures for testing breathalyzer machines and recording results); Biunno, *Current N.J. Rules of Evidence*, comment 2 on *N.J.R.E.* 202(b) (2002) (outlining other examples in which courts have taken judicial notice of certain facts in criminal cases).

## III.

### A.

■ Having addressed the Attorney General's motion, we now turn to the governing legal principles. The parties do not dispute that, in responding to the dispatched information, the officers subjected defendant to an investigatory stop (sometimes called an investigative detention). Consistent with the Fourth Amendment of the United States Constitution and its analog, Article I, paragraph 7 of the New Jersey Constitution, "a police officer is

justified in stopping a motor vehicle when he has an articulable and reasonable suspicion that the driver has committed a motor vehicle offense." *State v. Locurto,* 157 *N.J.* 463, 470, 724 *A.*2d 234, 238 (1999) (internal citation and quotation marks omitted); *Delaware v. Prouse,* 440 *U.S.* 648, 663, 99 *S.Ct.* 1391, 1401, 59 *L.Ed.*2d 660, 673 (1979).

 The "[r]easonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest." *State v. Stovall,* 170 *N.J.* 346, 356, 788 *A.*2d 746 (2002). The standard requires "'some minimal level of objective justification for making the stop.'" *State v. Nishina,* 175 *N.J.* 502, 511, 816 *A.*2d 153, 159 (2003) (quoting *United States v. Sokolow,* 490 *U.S.* 1, 7, 109 *S.Ct.* 1581, 1585, 104 *L.Ed.*2d 1, 10 (1989)). The test is "highly fact sensitive and, therefore, not readily, or even usefully, reduced to a neat set of legal rules." *Ibid.* (internal citation and quotation marks omitted). For analytical purposes in this case, a stop founded on a suspected motor vehicle violation essentially is governed by the same case law used to evaluate a stop based on suspected criminal or quasi-criminal activity.

 An informant's tip is a factor to be considered when evaluating whether an investigatory stop is justified. In that regard, we recently summarized the relevant principles followed by the United States Supreme Court and by this Court:

> An anonymous tip, standing alone, is rarely sufficient to establish a reasonable articulable suspicion of criminal activity. *Alabama v. White,* 496 *U.S.* 325, 329, 110 *S.Ct.* 2412, 2415, 110 *L.Ed.*2d 301, 308 (1990). The United States Supreme Court has warned that "the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable.'" *Ibid.* (quoting *Illinois v. Gates,* 462 *U.S.* 213, 237, 103 *S.Ct.* 2317, 2332, 76 *L.Ed.*2d 527, 548 (1983)). That Court also has instructed that an informant's "veracity," "reliability," and "basis of knowledge" are "relevant in determining the value of his report." *Id.* at 328, 110 *S.Ct.* at 2415, 110 *L.Ed.*2d at 308 (citation and quotation marks omitted). To justify action based on an anonymous tip, the police in the typical case must verify that the tip is reliable by some independent corroborative effort. *Id.* at 329–30, 110 *S.Ct.* at 2415–16, 110 *L.Ed.*2d at 309.
>
> Generally, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required

if the tip were more reliable." *Id.* at 330, 110 *S.Ct.* at 2416, 110 *L.Ed.*2d at 309. Stated differently, courts have found no constitutional violation when there has been "independent corroboration by the police of significant aspects of the informer's predictions[.]" *Id.* at 332, 110 *S.Ct.* at 2417, 110 *L.Ed.*2d at 310. The analysis in any given case turns ultimately on the totality of the circumstances. *Id.* at 330, 110 *S.Ct.* at 2416, 110 *L.Ed.*2d at 309.

[*State v. Rodriguez*, 172 *N.J.* 117, 127–28, 796 *A.*2d 857 (2002).]

Against the backdrop of those general rules, the United States Court of Appeals for the Eighth Circuit has addressed specifically whether an anonymous tip reporting erratic driving provides a constitutional basis to justify a motor vehicle stop. In *United States v. Wheat,* a motorist using a cell phone called 9–1–1 to report that "a tan-and-cream colored Nissan Stanza or 'something like that,' whose license plate began with the letters W–O–C, was being driven erratically in the northbound lane of Highway 169." 278 *F.*3d 722, 724 (8th Cir.2001), *cert. denied,* 537 *U.S.* 850, 123 *S.Ct.* 194, 154 *L.Ed.*2d 81 (2002).

The caller further stated that the Nissan was "passing on the wrong side of the road, cutting off other cars, and otherwise being driven as if by a 'complete maniac.' The 9–1–1 operator did not ask the caller to identify himself. Police dispatchers relayed the caller's tip to patrolling officers." *Ibid.* Shortly after receiving the dispatch, an officer "observed a tan Nissan Maxima whose license plate began with the letters W–O–C, stopped in the northbound lane of Highway 169[.]" *Ibid.* The Nissan then made a right turn, and the officer "stopped it immediately, without having observed any incidents of erratic driving." *Id.* at 724–25.

The Eighth Circuit rejected the defendant's argument that the anonymous call could not give rise to a reasonable suspicion sufficient to warrant the stop because the police never witnessed any traffic violation in progress or about to occur. *Id.* at 726, 729. The court compared the case before it with existing Supreme Court decisions that discuss, in other contexts, the degree to which the police might test an informant's credibility by reviewing the predictive information contained in the tip itself. The court noted:

A careful reading of the Supreme Court's Fourth Amendment jurisprudence suggests that this emphasis on the predictive aspects of an anonymous tip may be less applicable to tips purporting to describe contemporaneous, readily observable criminal actions, as in the case of erratic driving witnessed by another motorist.... Unlike with clandestine crimes such as possessory offenses, including those involving drugs or guns, where corroboration of the predictive elements of a tip may be the only means of ascertaining the informant's basis of knowledge, in erratic driving cases the basis of the tipster's knowledge is likely to be apparent. Almost always, it comes from his eyewitness observations, and there is no need to verify that he possesses inside information.

[*Id.* at 734.]

The court also outlined certain informational requirements that must be satisfied to uphold the stop. The court stated that the caller must

provide a sufficient quantity of information, such as the make and model of the vehicle, its license plate numbers, its location and bearing, and similar innocent details, so that the officer, and the court, may be certain that the vehicle stopped is the same as the one identified by the caller.

[*Id.* at 731.]

The court further emphasized that the "tip must also contain a sufficient quantity of information to support an inference that the tipster had witnessed an actual traffic violation that compels an immediate stop." *Id.* at 732.

In addition, the court noted that situations involving erratic driving present the public with dangers not found in other situations, such as when a tipster identifies a person suspected of carrying a concealed weapon:

The rationale for allowing less rigorous corroboration of tips alleging erratic driving is that the imminent danger present in this context is substantially greater (and more difficult to thwart by less intrusive means) than the danger posed by a person in possession of a concealed handgun. Therefore, the moving violation or violations alleged must suggest real exigency. An allegation of erratic driving will generally pass this test since it strongly suggests that the driver is operating under the influence of alcohol or drugs and is unable to control his vehicle.

[*Id.* at 732 n. 8.]

The court acknowledged that, on occasion, "even a supposedly contemporaneous account of erratic driving could be a complete work of fiction, created by some malicious prankster to cause trouble for another motorist." *Id.* at 735. On balance, however, with respect to accounts that otherwise seem credible under the

totality of circumstances, the court concluded that "the risk of false tips is slight compared to the risk of not allowing the police immediately to conduct an investigatory stop[.]" *Ibid.*

The *Wheat* court also cited state courts in other jurisdictions that have ruled similarly. *Id.* at 729–30. One such case is *State v. Boyea,* 171 *Vt.* 401, 765 *A.2d* 862 (2000), *cert. denied,* 533 *U.S.* 917, 121 *S.Ct.* 2524, 150 *L.Ed.2d* 696 (2001). There, an anonymous caller described a "blue-purple Volkswagen Jetta with New York plates, traveling south on I–89 in between Exits 10 and 11, operating erratically." *Id.* at 863. Based on that tip and without independently observing any problems, a patrolling officer located and stopped the vehicle in question. *Ibid.*

In upholding the validity of the stop, the Supreme Court of Vermont evaluated the reasonableness of the government's action in light of the "gravity of the risk of harm." *Id.* at 868 (internal citation and quotation marks omitted). The court indicated that it had "consistently recognized the serious threat posed to public safety by the frequency with which individuals, while under the influence of intoxicating liquor, continue to operate motor vehicles on the public highways." *Ibid.* (internal citation and quotation marks omitted). Consequently, the court concluded that "[b]alancing the public's interest in safety against the relatively minimal intrusion posed by a brief investigative detention, the scale of justice in this case must favor the stop; a reasonable officer could not have pursued any other prudent course." *Ibid.* (internal citation omitted).

The Supreme Court of Iowa reached the same result on similar facts in *State v. Walshire,* 634 *N.W.2d* 625 (2001). In that case, an anonymous caller informed the police that he suspected that an intoxicated motorist was driving a certain automobile in the median of a road. The caller described the vehicle's make, model, and license plate number. *Id.* at 625–26. The arresting officer located the car and stopped it solely on the basis of the call. *Id.* at 626. The officer "did not personally observe any behavior that would

[have] generate[d] reasonable suspicion" for a motor vehicle stop. *Ibid.*

In upholding the police conduct, the court observed that the information provided by the caller "did not concern concealed criminal activity, but rather illegality open to public observation." *Id.* at 627. The court further explained that "the call disclosed the means by which the information was obtained, *i.e.*, observation of the crime in progress[.]" *Id.* at 629. That, in essence, gave the caller a level of credibility analogous to a citizen informant serving as an eyewitness to an ongoing crime. *Ibid.* The court also observed that a tip involving the imminent danger posed by intoxicated drivers "might call for a relaxed threshold of reliability," and that as compared to a pat-down search of one's person, a motor vehicle stop involves a lesser intrusion on privacy. *Id.* at 630.

In yet another recent case, the Supreme Court of Wisconsin upheld an investigatory stop of a vehicle based on an anonymous tip alleging erratic driving. In *State v. Rutzinski,* a police officer on routine patrol "overheard a police dispatch[er] requesting a squad to respond" to a specific location. 241 *Wis.*2d 729, 623 *N.W.*2d 516, 519 (2001). The reason for the dispatch was that an "unidentified motorist calling from a cell phone [had] reported that he or she was observing a black pickup truck weaving within its lane, varying its speed from too fast to too slow, and 'tailgating.' " *Ibid.* Shortly thereafter, a second dispatch was issued, reporting "that the [caller] was still on the phone" indicating that the black pickup truck had traveled to a different location. *Ibid.* An officer stopped the vehicle without independent corroboration of the alleged erratic driving. *Ibid.*

In ruling that the police conduct was proper, the court relied on the fact that the caller "was making personal observations of [the defendant's] contemporaneous actions." *Id.* at 526. As a result, the caller's information carried a level of reliability not found in other settings. Moreover, like the other courts that have held similarly, the *Rutzinski* court recognized that the tip in question

suggested that the defendant "posed an imminent threat to the public's safety." *Ibid.* The court emphasized that the "tremendous potential danger presented by drunk drivers" was a significant factor to be considered when weighing the totality of the circumstances for purposes of determining the validity of the stop. *Ibid.*

## B.

We agree with those courts that have reduced the degree of corroboration necessary to uphold a stop of a motorist suspected of erratic driving in these circumstances. Similar to the reasoning of those courts, our rationale is threefold. First, by its nature, a call placed and processed via the 9–1–1 system carries enhanced reliability not found in other contexts. Second, the conduct at issue is the temporary stop of a motor vehicle based on reasonable suspicion, not the more intrusive search of its contents or arrest of its driver, which would be governed by different rules. Third, an intoxicated or erratic driver poses a significant risk of death or injury to himself and to the public and, as such, that factor is substantial when evaluating the reasonableness of the stop itself.

As for the first factor, the Legislature has enacted a series of statutes designed to implement an enhanced 9–1–1 system throughout New Jersey. *N.J.S.A.* 52:17C–1 to –16. Most significant for our purposes here, the statutes require telephone companies to furnish public-safety agencies with specific information in respect of any telephone used to initiate a 9–1–1 call. The law provides:

> Whenever possible and practicable, telephone companies shall forward to jurisdictional public safety answering points via enhanced 9–1–1 network features, the telephone number and street address of any telephone used to place a 9–1–1 call. Subscriber information provided in accordance with this section shall be used only for the purpose of responding to emergency calls or for the investigation of false or intentionally misleading reports of incidents requiring emergency service.
>
> [*N.J.S.A.* 52:17C–10a.]

In a related provision, the statute limits the liability of telephone carriers when they furnish the required information about their

customers, including non-published telephone numbers, as mandated under the act. *N.J.S.A.* 52:17C–10c.

Our statutes also criminalize the false reporting of emergencies and explicitly include within their ambit calls placed to 9–1–1. Generally, it is a crime for a person knowingly to report or make a false warning of an emergency that is likely to cause public inconvenience or alarm, or to transmit such false alarms "to or within any organization, official or volunteer, for dealing with emergencies involving danger to life or property." *N.J.S.A.* 2C:33–3a. Specifically in respect of the 9–1–1 system, "[a] person is guilty of a crime of the fourth degree if the person knowingly places a call to a 9–1–1 emergency telephone system without purpose of reporting the need for 9–1–1 service." *N.J.S.A.* 2C:33–3e.

In view of those provisions, we agree with the State that a 9–1–1 call carries a fair degree of reliability inasmuch as "it is hard to conceive that a person would place himself or herself at risk of a criminal charge by making such a call." The police maintain records of 9–1–1 calls not only for the purpose of responding to emergency situations but to investigate false or intentionally misleading reports. We acknowledge that it is possible to retain one's anonymity by placing a 9–1–1 call from a telephone booth or by using certain wireless technology. (According to the Attorney General, some types of cell phones are susceptible to "caller identification," whereas other types currently are not.) On balance, we are satisfied that in an expanding number of cases the 9–1–1 system provides the police with enough information so that users of that system are not truly anonymous even when they fail to identify themselves by name.

Accordingly, the State stands on firm constitutional ground when it treats the anonymous 9–1–1 caller in the same fashion as it would an identified citizen informant who alerts the police to an emergent situation. We previously have explained the difference between tips obtained by criminal as opposed to citizen informants:

Information given by the criminal informant is usually given in exchange for some "concession, payment or simply out of revenge against the subject," whereas an ordinary citizen acts with "an intent to aid the police in law enforcement because of his concern for society or for his own safety. He does not expect any gain or concession in exchange for his information."

[*Wildoner v. Borough of Ramsey,* 162 *N.J.* 375, 391, 744 *A.*2d 1146, 1155 (2000) (internal citation omitted).]

Analogous to a report offered by a citizen informant, the information imparted by a 9-1-1 caller should not be "viewed with the same degree of suspicion that applies to a tip by a confidential informant." *Id.* at 390, 744 *A.*2d at 1155.

The second factor in our analysis is the nature of the intrusion at issue. We reaffirm the enhanced protections that we have accorded citizens under the New Jersey Constitution, particularly in respect of motor vehicles. *See, e.g., State v. Cooke,* 163 *N.J.* 657, 670, 751 *A.*2d 92, 99 (2000) (declining to apply reduced federal standard when evaluating automobile exception to warrant requirement); *State v. Carty,* 170 *N.J.* 632, 647, 790 *A.*2d 903, 912 (establishing State standard for obtaining consent to search automobile, beyond valid motor vehicle stop), *modified,* 174 *N.J.* 351, 806 *A.*2d 798 (2002). Without diminishing those protections, the fact remains that in the hierarchy of interests, "[t]here is a lesser expectation of privacy in one's automobile, and in one's office, than in one's home." *State v. Johnson,* 168 *N.J.* 608, 625, 775 *A.*2d 1273, 1283 (2001) (internal citations omitted).

From a constitutional standpoint, that lesser privacy interest and the nature of the intrusion (an investigatory stop, not a full-blown search, prompted by allegations of erratic driving) are relevant in assessing the reasonableness of the government's conduct. If those variables were absent or existed under different conditions, our analysis might differ. For example, an anonymous call to 9-1-1 reporting that an individual possessed illegal narcotics in his car or home would not, absent other factors, lend itself to the kind of reduced corroboration permitted in this case. In short, we do not intend our analysis to apply blindly to other search-and-seizure questions that ordinarily would turn on principles or considerations not implicated here.

■ The final factor warranting a reduced degree of corroboration is the reality that intoxicated drivers pose a significant risk to themselves and to the public. See *State v. Tischio,* 107 *N.J.* 504, 519, 527 *A.*2d 388, 396 (1987) (describing such drivers as "moving time bombs") (internal citation and quotation marks omitted), *appeal dismissed,* 484 *U.S.* 1038, 108 *S.Ct.* 768, 98 *L.Ed.*2d 855 (1988). "The combination of an undue ingestion of alcohol and the resultant mishandling of automobiles causes awesome carnage on our highways[.]" *State v. Carey,* 168 *N.J.* 413, 429, 775 *A.*2d 495, 505 (2001) (internal citation and quotation marks omitted). That reality imposes a duty on law enforcement officers to take appropriate steps within constitutional and statutory boundaries to maintain the safety of New Jersey's roads. *State v. Greeley,* 178 N.J. 38, 49, 834 A.2d 1016, 1023 (2003) (recognizing "continuing duty of the police to safeguard the public" from "dangers" imposed by intoxicated persons and also recognizing "risks posed by an intoxicated person to himself").

■ Because the Constitution "is not a suicide pact[,]" *Kennedy v. Mendoza–Martinez,* 372 *U.S.* 144, 160, 83 *S.Ct.* 554, 563, 9 *L.Ed.*2d 644, 656 (1963), it permits courts to consider exigency and public safety when evaluating the reasonableness of police conduct, *State v. DeLuca,* 168 *N.J.* 626, 634, 775 *A.*2d 1284, 1288 (2001). In a different context, those same factors help justify the authority conferred on the government to implement suspicionless sobriety stops to check motorists for possible intoxication. *State v. Hester,* 245 *N.J.Super.* 75, 81, 584 *A.*2d 256, 259 (App.Div.1990). The risk to life and safety posed by an intoxicated or erratic driver convinces us that it is reasonable and, therefore, constitutional for the police to act on information furnished by an anonymous 9–1–1 caller without the level of corroboration that traditionally would be necessary to uphold such action.

■ We do not, however, suggest that *any* information imparted by a 9–1–1 caller will suffice. The information must convey an unmistakable sense that the caller has witnessed an ongoing offense that implicates a risk of imminent death or serious

injury to a particular person such as a vehicle's driver or to the public at large. The caller also must place the call close in time to his first-hand observations. When a caller bears witness to such an offense and quickly reports it by using the 9–1–1 system, those factors contribute to his reliability in a manner that relieves the police of the verification requirements normally associated with an anonymous tip.

 Nor do we suggest that *no* corroboration or predictive information is necessary in this setting. We adopt the formulation of other courts that the 9–1–1 caller must provide a sufficient quantity of information, such as an adequate description of the vehicle, its location and bearing, or "similar innocent details, so that the officer, and the court, may be certain that the vehicle stopped is the same as the one identified by the caller." *Wheat*, *supra*, 278 *F*.3d at 731. We are satisfied that such details, when verified or observed by the officer conducting the stop and viewed within the context of the factors described above, provide an adequate basis under the Fourth Amendment and Article I, paragraph 7 to justify the government's conduct.

## IV.

 With those tenets in mind, we turn to the case at hand. At the suppression hearing conducted by the municipal court, the officer testified that the dispatched information concerning defendant's vehicle had been transmitted to him "through a communication[s] center in Somerville." Although the officer did not explicitly describe that unit as the county's 9–1–1 call center, we are able to infer that fact or take judicial notice of it consistent with the information submitted by the Attorney General. See *Nishina*, *supra*, 175 *N.J.* at 507, 816 *A*.2d 153 (taking notice of fact that school identified at suppression hearing served students through fourth grade although no testimony specifically established that fact).

Specifically, as we understand the Attorney General's submission, when a caller dials 9–1–1 the call is switched automatically to

a unit such as the communications center in Somerville, which serves as Somerset County's 9–1–1 call center. The police maintain written abstracts and tape recordings of each call, and readily can retrieve or use those records for investigatory purposes. See *N.J.A.C.* 17:24–2.1, –2.4 (setting forth rules governing creation and retention of 9–1–1 records). Thus, the first factor necessary to employ a reduced degree of corroboration in respect of the caller's information is present here, namely, that the caller utilized the 9–1–1 system to initiate the police conduct.

As for the second and third factors, the intrusion involved a stop of defendant's motor vehicle on a public road, and the officer was informed that the vehicle was "weaving back and forth," and was "out of control." Those factors implicate the reduced privacy interests and safety concerns more fully described above. Moreover, the caller's information unmistakably conveyed a sense that he personally had witnessed an offense in progress and had reported it close in time to his first-hand observations. (The fact that the police located the moving vehicle still on Route 206 supports an inference that the caller reported the vehicle's whereabouts soon after his original observations.)

The remaining question is whether the caller described the vehicle with sufficient specificity to permit the officers reasonably to conclude that defendant's truck was, in fact, the suspected vehicle. The short answer is yes. The caller indicated that the vehicle was a blue pickup truck with a license plate number VM–407B, "heading northbound on Route 206 into Peapack." The caller therefore described four separate facts, (1) the vehicle's color, (2) the type of vehicle, (3) the vehicle's license plate number, and (4) the vehicle's approximate location or direction, all of which matched facts relating to defendant's vehicle, except for a minor discrepancy in the plate number.

In that regard, the testifying officer stated that he had observed "a blue pick-up truck pass in front of him" in the direction and on the road indicated by the caller. At some juncture the officer noticed that the vehicle's license plate number "was off one last

letter [from the caller's description]." That the plate's last letter might have been a "V" as opposed to a "B" is constitutionally insignificant when considered along with the other information supplied by the caller. It would have been reasonable for the officers to assume that the two like-sounding letters were confused in transmission. In any event, that lone error does not diminish our finding that the caller imparted sufficient information via the 9-1-1 system to furnish a reasonable basis for the police to effect a constitutional stop under the totality of circumstances.

In arguing a contrary conclusion, defendant cites a decision of the United States Supreme Court, *Florida v. J.L.*, 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000), and a decision of this Court, *Rodriguez, supra*, 172 *N.J.* 117, 796 *A.*2d 857. In *J.L., supra*, "an anonymous caller reported to the [police] that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 *U.S.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 258-59. The call apparently was not recorded and there was "nothing known about the informant" or the location of his call. *Ibid.* When the police responded they found a person who matched the description "just hanging out" at the bus stop. *Ibid.* Based solely on the anonymous tip, one of the officers approached the defendant, frisked him, and seized a gun from his pocket. *Ibid.*

In invalidating the search, the Supreme Court concluded that the information furnished by the informant was insufficient to justify the police encounter. *Id.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260-61. Writing for a unanimous Court, Justice Ginsburg explained: "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]." *Ibid.* Thus, the tip lacked even a "moderate indicia of reliability" necessary to sustain the government's action. *Ibid.*

Justice Ginsburg, however, was careful in suggesting that "the danger alleged in an anonymous tip might be so great as to justify

a search even without a showing of reliability." *Id.* at 273, 120 *S.Ct.* at 1380, 146 *L.Ed.*2d at 262. She amplified that suggestion by cautioning that the Court was not holding "that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, and schools, cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere." *Id.* at 274, 120 *S.Ct.* at 1380, 146 *L.Ed.*2d at 262 (internal citations omitted).

In a thoughtful concurring opinion, Justice Kennedy also indicated that future conditions might allow for a court to uphold police conduct based on an anonymous tip under circumstances similar to those found in a 9–1–1 case. He explained:

If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip.

. . . .

Instant caller identification is widely available to police, and, if anonymous tips are proving unreliable and distracting to police, squad cars can be sent within seconds to the location of the telephone used by the informant. Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller. It is unlawful to make false reports to the police, and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips.

These matters, of course, must await discussion in other cases, where the issues are presented by the record.

[*Id.* at 276, 120 *S.Ct.* at 1381, 146 *L.Ed.*2d at 263–64 (Kennedy, J., concurring) (internal citations omitted).]

This, it seems to us, is the kind of case envisioned by the *J.L.* Court in which the investigatory stop is sustainable based on the content of the caller's tip and its urgent manner of transmission. Unlike the informant in *J.L.*, the caller here "place[d] his anonymity at risk" by virtue of using the 9–1–1 system. In *J.L.* there was no record made of the anonymous informant's call to the police, whereas telephone companies in New Jersey are required, whenever possible, to furnish certain information about 9–1–1 callers to the appropriate public-safety agencies. Those records, combined with voice recordings of such calls, provide the police

with an ability to trace the identity of the caller in a manner that enhances his reliability.

Moreover, as already noted, the narrow question is whether there was a sufficient basis to stop the vehicle, not whether grounds existed for the police to search its contents or arrest its driver. Those more intrusive forms of conduct are governed by existing case law, the validity of which remains undisturbed by our holding in this case. *See, e.g., Cooke, supra,* 163 *N.J.* at 670, 751 *A.*2d at 99 (establishing State rules governing warrantless automobile searches); *Carty, supra,* 170 *N.J.* at 647, 790 *A.*2d at 912 (same in respect of automobile consent searches); *State v. Pavao,* 239 *N.J.Super.* 206, 209, 570 *A.*2d 1285, 1286–87 (App.Div.) (discussing standards for requesting motorist to submit to breathalyzer test and effecting valid DWI arrest), *certif. denied,* 122 *N.J.* 138, 584 *A.*2d 211, *cert. denied,* 498 *U.S.* 898, 111 *S.Ct.* 251, 112 *L.Ed.*2d 209 (1990).

Perhaps most important, here the officer was confronted with a risk of imminent danger to defendant and to the public, a circumstance that allowed the officer less corroboration time than if the tip had alleged that an individual standing passively on a street corner was carrying a concealed weapon. Although unlawfully concealing a weapon poses a public-safety risk, driving a pickup truck erratically on a highway such as Route 206 is a more immediate threat. In such urgent situations, a police officer need not wait for corroboration that might be fatal to an innocent member of the public or to the driver himself. Courts in other jurisdictions have distinguished *J.L.* using the same or a similar rationale. *E.g., Wheat, supra,* 278 *F.*3d at 729–36; *Boyea, supra,* 765 *A.*2d at 866–67; *Walshire, supra,* 634 *N.W.*2d at 627–30; *Rutzinski, supra,* 623 *N.W.*2d at 525–27.

In the same vein, it bears repeating that the *J.L.* Court itself suggested a public-safety exception to its holding. Justice Ginsburg instructed: "We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the

police can constitutionally conduct a frisk." *J.L., supra,* 529 *U.S.* at 273–74, 120 *S.Ct.* at 1380, 146 *L.Ed.*2d at 262. We find the bomb example to be particularly apt because, as already noted in this opinion, this Court previously has described intoxicated motorists as "moving time bombs." *Tischio, supra,* 107 *N.J.* at 519, 527 *A.*2d at 396 (internal citation and quotation marks omitted).

Although we analyze this case in terms of "reduced" or "less rigorous" corroboration than might apply in other settings, our decision can just as readily be described as doing no more than accepting a level of corroboration commensurate with the level of threat implicated by the tip at issue. In other words, we do not in this case reduce the degree of corroboration necessary to ensure the tip's reliability. Rather, we consider the citizen caller to have sufficient inherent reliability given the nature and content of the 9–1–1 communication so that an independent corroborative effort, beyond confirmation of the vehicle's description, is not constitutionally required.

Our analysis likewise is consistent with *Rodriguez, supra,* 172 *N.J.* 117, 796 *A.*2d 857. In that case, an anonymous informant alleged that two men traveling by bus were engaged in illegal drug trafficking. *Id.* at 121–22, 796 *A.*2d at 859–60. The police observed two men, including the defendant, matching the description provided by the informant. *Id.* at 122, 796 *A.*2d at 859. The officers thereafter subjected the defendant to an investigative detention by quickly moving him from the public street to a patrol office contained within the bus terminal. *Id.* at 128, 796 *A.*2d at 863. The State sought to uphold the detention solely on the basis of the anonymous tip. *Id.* at 129–30, 796 *A.*2d at 864–64.

Relying on *J.L.,* we ruled in favor of the defendant, concluding that his detention could not be justified based on what the police knew at the time of the encounter. *Id.* at 131, 796 *A.*2d at 865. However, just as this case differs from *J.L.,* it also differs from *Rodriguez.* In *Rodriguez,* there was no immediate safety risk either to the public in general or to the officers specifically. In that respect, we noted that the record in that case contained "no basis

to conclude that a concern for officer safety justified the movement of [the] defendant from the street to the patrol office." *Id.* at 128, 796 *A.*2d at 863. By comparison, the purpose of the stop in the case before us was to protect defendant and the public from a threat of death or serious injury occasioned by defendant's suspected condition.

We acknowledge that a few state courts have viewed these issues differently. *See, e.g., McChesney v. State,* 988 *P.*2d 1071, 1078 (Wyo.1999) (concluding in three-to-two decision that tip concerning erratic driving did not create adequate basis for investigatory stop). However, in addressing a question that turns ultimately on the reasonableness of the government's conduct, we evaluate that conduct in view of local conditions. In so doing, we note that automobiles and other vehicles densely populate New Jersey's roads. See New Jersey Motor Vehicle Commission, *About MVC, at* http://www.state.nj.us/mvc/about_mvc. html (last updated Oct. 28, 2003) (indicating that there are nearly six million licensed motorists in this State). Against that backdrop, the police acted reasonably in stopping defendant's vehicle based on the caller's information, the method by which they had received it, and the concern for safety that remains at the heart of this case.

▪ In sum, as a general rule, "[a]n anonymous tip, standing alone, is rarely sufficient to establish a reasonable articulable suspicion of criminal activity." *Rodriguez, supra,* 172 *N.J.* at 127, 796 *A.*2d at 862. This case, however, falls within that narrow band of cases in which a 9–1–1 call carries sufficient reliability to sustain a motor vehicle stop when the purpose of that stop is to prevent imminent harm to the vehicle's driver or to the public. We are persuaded that the *J.L.* decision contemplates such a holding, which also is consistent with this Court's prior jurisprudence, including *Rodriguez.* For those reasons, we conclude that the stop of defendant's vehicle was valid under the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution.

## V.

The judgment of the Appellate Division is reversed.

*For reversing*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN, and WALLACE—7.

*Opposed*—None.