**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3940-23

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

JEROME L. GAYDEN,
a/k/a ROBERT GAYDEN,
JEROME L. GAYDON,
and J SKI,

     Defendant-Respondent.

_____

Argued January 29, 2025 – Decided May 22, 2025

Before Judges Rose and DeAlmeida.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 21-10-0676.

Timothy Kerrigan, Chief Assistant Prosecutor, argued the cause for appellant (Camelia M. Valdes, Passaic County Prosecutor, attorney; Timothy Kerrigan, of counsel and on the briefs).

Tamar Y. Lerer, Deputy Public Defender, argued the cause for respondent (Jennifer N. Sellitti, Public

Defender, attorney; Tamar Y. Lerer, of counsel and on the brief).

PER CURIAM

By leave granted, the State appeals from the July 5, 2024 Law Division order granting defendant Jerome L. Gayden's motion to suppress evidence obtained during a pedestrian investigatory stop. We affirm.

I.

In 2021, a grand jury charged defendant with: second-degree unlawful possession of a weapon without a permit, N.J.S.A. 2C:39-5(b)(1); fourth-degree possession of a large capacity magazine, N.J.S.A. 2C:39-3(j); fourth-degree possession of a prohibited device (hollow nose bullets), N.J.S.A. 2C:39-3(f)(1); third-degree receiving stolen property, N.J.S.A. 2C:20-7(a); second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b); and first-degree unlawful possession of a weapon by a felon, N.J.S.A. 2C:39-5(j). The charges arose after police officers stopped defendant on a sidewalk and found him in possession of a loaded weapon following a 9-1-1 call that a person matching defendant's description was carrying a weapon. The encounter was recorded by a video surveillance camera.

Defendant moved to suppress the evidence obtained during the stop. He argued that a report of criminal activity obtained during a 9-1-1 call requires

2

corroboration before officers can conduct an investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968), which the officers failed to do before stopping him. On the return date of the motion, defense counsel requested an opportunity to challenge the officers' credibility at an evidentiary hearing. The court denied that request and issued an oral decision denying the motion based on its review of written police reports and its viewing of the video recording of the arrest outside of the presence of counsel.

Defendant subsequently pleaded guilty to second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1). In accordance with a plea agreement, the court sentenced defendant to a five-year term of incarceration with a forty-two-month period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c). Defendant subsequently appealed his conviction, arguing the court erroneously denied his suppression motion without a hearing. In the alternative, defendant sought a remand for an evidentiary hearing.

We vacated the order. State v. Gayden, No. A-0890-22 (App. Div. Mar. 8, 2024) (slip op. at 14-15). We concluded the motion court erred when it resolved disputed issues of material fact relating to defendant's motion to suppress without holding an evidentiary hearing. Id. at 14. We noted defendant was not given an opportunity to challenge the credibility of the officers' account

of the arrest through cross-examination or offer his view of what is depicted in the video. Ibid.

We remanded the matter for an evidentiary hearing on defendant's motion. Ibid. Because the judge who initially decided defendant's motion had already engaged in weighing the evidence and rendered a decision on the credibility of the officers, we directed the hearing on remand take place before a different judge. Id. at 14-15; see N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 617 (1986).[1]

On remand, the motion court held an evidentiary hearing at which Paterson Police Officer Hector Mendez, who stopped defendant, testified as follows. At approximately 9:30 p.m. on August 12, 2021, he was on patrol in Paterson in a marked police vehicle with his partner, who was driving. Mendez was in the front passenger seat. The officers received a transmission over the radio directing them to respond to a report of a black man with dreadlocks in front of a specified address who was wearing a white tank top and blue shorts, walking with crutches, and had a handgun in his pocket.

---

[1] We did not vacate defendant's conviction. We instead held that if, after the evidentiary hearing on remand, the motion to suppress was granted, defendant could move to withdraw his guilty plea. Gayden, slip op. at 15.

4

As the officers approached the address, a car mechanic's shop with an open area parking lot in front, Mendez saw a person, later identified as defendant, matching the physical and clothing description given by the dispatcher, walking with crutches. Defendant had separated from a group and was heading away from the approaching patrol vehicle. The area was well lit by streetlights and artificial lights from surrounding buildings.

As defendant crossed the property toward the sidewalk, Mendez's partner pulled the patrol vehicle off the street at an angle onto the sidewalk near defendant. As the patrol vehicle pulled up, Mendez made eye contact with defendant, who was at that point directly in front of the vehicle. Defendant appeared startled and made a single hop with his crutches as the police vehicle approached and jolted to a stop. Defendant thereafter quickened his pace as he continued to walk away from the officers.

Mendez exited the patrol vehicle and noticed defendant was wearing a fanny pack strapped across his torso. As defendant walked with the crutches, Mendez observed the fanny pack swaying left to right in a manner suggesting it contained a heavy object. Mendez said to defendant, "Come here. I want to talk to you, we need to talk." Defendant ignored Mendez and continued to walk away from the officers, further accelerating his pace.

5

Within two and a half seconds of exiting the patrol vehicle, Mendez detained defendant by wrapping his hands around his torso. While doing so, Mendez felt a heavy metallic object in front of defendant's torso in the area of the fanny pack. As Mendez placed defendant in handcuffs, his partner conducted a pat down and found a handgun with a loaded magazine sticking out of defendant's open fanny pack.

Mendez testified that when he first saw defendant his intention was to conduct a field inquiry. However, Mendez's suspicion that defendant was engaged in criminal activity grew when he observed defendant's startled look as the police vehicle approached and, after he exited the patrol vehicle, saw defendant's fanny pack swaying in a way suggesting it contained a heavy object. Mendez testified that in his experience a person who looks startled at the arrival of police "ha[s] something to hide." Based on the dispatch report that the person matching defendant's description had a gun in his pocket, Mendez suspected the fanny pack contained a gun.

On June 28, 2024, the motion court issued an oral opinion granting defendant's motion. The court framed the critical issue as follows:

> As testified by Officer Mendez[,] this case boils down to two and a half seconds. Two and a half seconds of time captured on video camera which the State contends was enough time for Officer Mendez to

6

observe defendant . . . appearing startled, giv[e] a command to the defendant to stop, [and] for defendant to ignore commands, accelerate his pace as he attempt[ed] to flee on crutches, and be detained.

After summarizing Mendez's account of what transpired in the short time between his arrival on scene and his arrest of defendant, the court stated that it did

not find Officer Mendez's testimony credible. While he answered all questions asked without hesitation and his demeanor was seemingly calm and controlled, his answers were inconsistent with the video surveillance and his testimony was wholly unreasonable.

The court gave "no weight" to Mendez's

testimony that the startled look of [d]efendant was that of a person involved in a crime. Instead[,] the startled look of defendant was that of a person on crutches trying to avoid being hit by a patrol car that had sped up so fast at the driveway that it came to an abrupt stop and jolted back as he was crossing in front of it.

The court also gave "no weight" to Mendez's testimony that defendant accelerated his pace and continued to walk away from the officers after Mendez ordered him to stop. The court noted that during cross-examination Mendez admitted it would take two seconds to say, "[h]ey, you, stop, we want to talk to you." Yet, the entire time between Mendez exiting the police vehicle and physically seizing defendant was two and a half seconds. Thus, the court found

7 <span>A-3940-23</span>

it was not possible for Mendez to give those orders, observe defendant's fanny pack swaying from side to side, and determine defendant was accelerating his pace as he walked away from the officers in two and a half seconds, as he testified. The court also found defendant took one step to avoid being hit by the patrol vehicle, followed by two steps before he was restrained by Mendez, negating testimony that defendant attempted to flee after Mendez ordered him to stop.

The court rejected the State's argument that Mendez testified the stop took place in a high crime area. The court explained, "all I have are conclusory terms that it was a high crime area. The testimony was limited to the . . . officer's years on the job and the number of firearm investigations and nothing else."[2] In addition, the court rejected Mendez's testimony that defendant broke away from a group when the officers approached, an act Mendez described as indicative of an effort to avoid apprehension. The court found it was "clear that [defendant] ha[d] already left the group before the officers even arrive[d] . . . ." The court

---

[2] Our review of the transcript reveals a single reference by Mendez to "high crime." He testified that he was assigned to the emergency response team and that "on a regular patrol day, they assign us to specific areas in Paterson where high crimes are being on – on the rise." This testimony falls short of evidence establishing "the character and prevalence of crime in an area" necessary to establish it is a high-crime area. State v. Goldsmith, 251 N.J. 384, 405 (2022).

A-3940-23

concluded that Mendez made no observations corroborating the information given by the 9-1-1 caller before detaining defendant.

The court also found that Mendez's testimony was inconsistent with the written report completed shortly after defendant's arrest.  The court found that Mendez's testimony describing the timing of significant events – making eye contact with defendant, observing defendant's startled expression, telling defendant the officers wanted to speak with him, observing the swaying of defendant's fanny pack – was inconsistent with the written report.

The court concluded that, based on the totality of the circumstances, the officer did not have specific and articulable facts constituting reasonable suspicion of criminal activity justifying a Terry stop.  The court concluded the stop was unlawful and suppressed the evidence seized from defendant.[3]

On July 5, 2024, the court entered an order granting defendant's motion.[4] Also on July 5, 2024, the State moved for leave to appeal.

---

[3]  After the court granted defendant's motion, he moved to withdraw his guilty plea.  The court denied the motion.  Defendant completed his custodial sentence in February 2025.

[4]  The order is dated both June 28, 2024, and July 5, 2024, but is stamped as filed on July 5, 2024.

 A-3940-23

On July 9, 2024, the court filed a written amplification of its decision granting defendant's motion.  R. 2:5-1(d).  The amplification is substantively consistent with the court's oral decision.

On August 15, 2024, we granted the State's motion for leave to appeal. The State raises the following arguments.

POINT I

THE ORDER SUPPRESSING EVIDENCE SHOULD BE REVERSED; THE INVESTIGATORY STOP WAS SUPPORTED BY REASONABLE SUSPICION.

1.    [THE MOTION COURT]'S ERRANT RULING EXCLUDING EVIDENCE RELATED TO THE 9-1-1 CALL PREJUDICED THE STATE AND COMPROMISED THE . . . COURT'S DECISION.

2.    THE 9-1-1 CALL, EVEN IF IT WERE CONSIDERED ALONE, ESTABLISHED REASONABLE SUSPICION.

3.    THE 9-1-1 CALL, CONSIDERED ALONGSIDE THE OTHER EVIDENCE, ESTABLISHED REASONABLE SUSPICION.

4.    [THE MOTION COURT]'S ADVERSE CREDIBILITY FINDING IS CLEARLY MISTAKEN AND SHOULD BE REVERSED.

II.

Our scope of review of the motion court's suppression order is well established.  Our review of the court's factual findings after a hearing is

"exceedingly narrow." State v. Locurto, 157 N.J. 463, 470 (1999) (citing State v. Johnson, 42 N.J. 146, 161-62 (1964)). Our deference includes the trial court's findings based on video recording or documentary evidence. See State v. S.S., 229 N.J. 360, 374-81 (2017) (clarifying the deferential and limited scope of appellate review of factual findings based on video evidence); see also State v. McNeil-Thomas, 238 N.J. 256, 271-72 (2019). Deference is afforded because the court's findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." Locurto, 157 N.J. at 474. We must defer to those findings so long as they are supported by sufficient credible evidence in the record. State v. Nelson, 237 N.J. 540, 551 (2019) (quoting In Interest of J.A., 233 N.J. 432, 445 (2018)). By contrast, the court's interpretation of the law and the legal "consequences that flow from established facts" are reviewed de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

Both the United States and New Jersey Constitutions protect citizens against unreasonable searches and seizures. See U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. The parties agree that the officers' encounter with defendant was an investigatory stop, which constitutes a seizure under both the federal and State constitutions. An investigatory stop or detention, sometimes referred to as

a <u>Terry</u> stop, involves a temporary seizure that restricts a person's movement. A <u>Terry</u> stop implicates a constitutional requirement that there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." <u>State v. Elders</u>, 192 N.J. 224, 247 (2007) (quoting <u>State v. Rodriguez</u>, 172 N.J. 117, 126 (2002)).

The State has the burden to establish that a stop was valid. <u>State v. Mann</u>, 203 N.J. 328, 337-38 (2010); <u>State v. Pineiro</u>, 181 N.J. 13, 20 (2004). If there was no reasonable suspicion of criminal activity to justify the stop, evidence discovered as a result of the stop is subject to exclusion. <u>State v. Chisum</u>, 236 N.J. 530, 546 (2019).

To determine whether reasonable suspicion existed, a judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. <u>Nelson</u>, 237 N.J. at 554 (quoting <u>State v. Stovall</u>, 170 N.J. 346, 361 (2002)). Investigatory stops are justified "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." <u>State v. Davis</u>, 104 N.J. 490, 505 (1986).

> A court must first consider the officer's objective observations. The evidence collected by the officer is

"seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. [A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." Second, a court must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing."

[Id. at 501 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)) (alterations in original).]

We begin our analysis with the reliability of the 9-1-1 caller's report. While the record contains Mendez's account of the dispatcher's transmission of the 9-1-1 caller's report, the State produced no evidence identifying the 9-1-1 caller or explaining how he or she obtained the information given to the dispatcher on the 9-1-1 call.[5] Because the State did not produce evidence

---

[5] During direct examination, the State asked Mendez what information was transmitted to the officers by the dispatcher. Defendant objected, arguing that the dispatcher's transmission repeating what the 9-1-1 caller said to the dispatcher was inadmissible hearsay. The court reserved decision on the objection, stating that the testimony was admissible to establish the effect of the dispatcher's transmission on the officers and that it would revisit the objection if the State attempted to use the dispatch transmission to prove the truth of the matters asserted by the 9-1-1 caller. At the conclusion of the hearing, the court noted it was not necessary to decide defendant's objection. On appeal, the State argues that the court erred by precluding admission of evidence relating to the identity of the 9-1-1 caller or how the caller obtained the information given to the dispatcher on the 9-1-1 call. The State, however, fails to identify the evidence it claims was precluded by the court. Our review of the transcript revealed no attempt by the State to introduce such evidence.

establishing that the 9-1-1 caller was a confidential informant or other person whose credibility was known to police, we assume the caller was an ordinary citizen.

"Generally speaking, information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster." State v. Basil, 202 N.J. 570, 586 (2010). "Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information." Ibid. This is so because "we assume that an ordinary citizen 'is motivated by factors that are consistent with law enforcement goals,'" ibid. (quoting Davis, 104 N.J. at 506), and thus may be regarded as trustworthy. State v. Hathaway, 222 N.J. 453, 471 (2015). Information received from a citizen "concerning a criminal event would not especially entail further exploration or verification of his personal credibility or reliability before appropriate police action is taken." Ibid. (quoting Davis, 104 N.J. at 506).

In each of these precedents, our Supreme Court found that the anonymous report of criminal activity by an ordinary citizen, when considered in context with other facts, was sufficient to give law enforcement personnel authority to enter a home under the emergency aid exception to the warrant requirement, see

A-3940-23

State v. Frankel, 179 N.J. 586, 598 (2004), effectuate an arrest based on probable cause, or conduct a Terry stop. A critical element of the Court's analysis in each case was that the citizen reported criminal acts based on personal knowledge.

For example, in Basil, the victim of a crime, who refused to identify herself out of fear for her safety, approached an officer when he arrived at the scene and said that Basil had pointed a shotgun at her before tossing the weapon under a nearby car. 202 N.J. at 587. Her statement was based on "information from her personal knowledge regarding events that occurred minutes earlier." Ibid. "Importantly, the young woman's reliability was immediately corroborated by the discovery of the shotgun in the precise location where she said it was discarded." Ibid. The Court found that the citizen's corroborated report gave the officer probable cause to arrest Basil. Ibid.

Similarly, in Hathaway, at approximately 4:00 a.m., the "animated" and "upset" victim of an armed robbery approached casino security personnel and reported that he had been robbed at gunpoint and forced to disrobe in his hotel room. 222 N.J. at 461. A few minutes later, the victim left the casino without revealing his identity. Ibid. The security official viewed a surveillance video that confirmed that the victim had arrived at a specific hotel room with two men and two women, and left alone in what appeared to be a panic shortly before

15

giving his report of having been robbed.  Id. at 462.  The security official relayed this information, and his observation that the gunmen and two women may still be in the room, to a law enforcement officer.  Ibid.  The Court found that the officer had no objectively reasonable basis to doubt the victim's report, id. at 476, and an objectively reasonable basis to believe that an emergency required him to enter the hotel room without a warrant.  Id. at 476-79.

In Davis, a member of the local first aid squad called 9-1-1 to report that he observed two men on bicycles "hanging around" a closed gas station just before midnight.  104 N.J. at 494.  Based on that information, an officer, who found no one at the gas station, searched for the suspects in his patrol car.  Id. at 495.  About three blocks from the station, the officer encountered two men on bicycles riding against traffic, whom he stopped pursuant to Terry.  Ibid. Ultimately, the two men admitted they had stolen the bicycles.  Id. at 496.  The Court found that a member of a first aid squad "while not part of the government, is more involved and presumably more public spirited than the average citizen." Id. at 506.  Thus, the Court found, "[t]he police could . . . rely on him as a credible source of information."  Ibid.  The Court concluded the report "furnished [a] sufficient basis for the police to investigate whether criminal activity had occurred or was about to occur," justifying a Terry stop.  Ibid.

In addition, a call placed through 9-1-1 "carries enhanced reliability not found in other contexts" because the 9-1-1 system records information identifying the phone number and location from which the call is made. State v. Golotta, 178 N.J. 205, 218 (2003). "Our statutes also criminalize the false reporting of emergencies and explicitly include within their ambit calls placed to 9-1-1." Id. at 219. "In view of those provisions, . . . a 9-1-1 call carries a fair degree of reliability inasmuch as 'it is hard to conceive that a person would place himself or herself at risk of a criminal charge by making'" a false report of criminal activity through 9-1-1. Ibid.

Here, the record does not establish the identity of the 9-1-1 caller or the basis on which he or she obtained the information given to the dispatcher and relayed to the officers. The transmission did not state that the 9-1-1 caller personally observed criminal conduct or otherwise explain the basis for caller's belief that the person he or she described was armed. In addition, the dispatcher did not state the 9-1-1 caller reported that the armed person was brandishing the weapon, threatening any person, or endangering public safety. While Mendez immediately observed a person matching the physical and clothing descriptions given by the 9-1-1 caller when he arrived on the scene, that observation, standing alone, was insufficient to justify an investigatory stop of defendant. Observation

17 <span>A-3940-23</span>

by police of a person who matches the physical description given by "an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about" the perpetrator is insufficient to constitute reasonable suspicion to conduct an investigatory stop without corroboration. Florida v. J.L., 529 U.S. 266, 271 (2000) (involving a tip relayed by telephone to police on unrecorded line). To lawfully seize defendant and subject him to a pat down, it was necessary for Mendez to first obtain reasonable suspicion through corroboration that criminal activity had occurred or would shortly occur. Id. at 272.

The remand court, having had the benefit of observing Mendez's testimony and reviewing the video recording, found the officer's account of his observations prior to seizing defendant lacked credibility. The court concluded it was not possible for the officer to have seen defendant's startled expression, observed defendant's fanny pack swaying in a manner suggesting it contained a weapon, commanded defendant to stop, and observed defendant's quickened pace within two and a half seconds. In addition, the court found Mendez's testimony that defendant's startled look was indicative of his involvement in criminal activity to lack credibility. The court found defendant was startled because the rapidly approaching patrol vehicle came to an abrupt halt next to

him while he was walking on crutches. In addition, the court found that any quickening of defendant's pace was to avoid being struck by the patrol vehicle.

We are unconvinced by the State's argument that the court's credibility determinations and findings of fact lack sufficient support in the record. To the contrary, the court explained in detail the reasons it found Mendez's testimony with respect to critical events in his encounter with defendant to lack credibility and identified the evidentiary basis of its factual findings.

The fact that the court made findings inconsistent with those made by a different judge the first time defendant's motion was considered is immaterial to our analysis. We vacated the order denying defendant's motion because of errors in the prior judge's decision making process, including not holding an evidentiary hearing at which Mendez's credibility could be tested, and remanded for a new hearing, thereby nullifying the prior findings of fact and conclusions of law. It is not uncommon for evidence to be subject to varying reasonable interpretations. "When more than one reasonable inference can be drawn from the review of a video recording . . . then the one accepted by the trial court cannot be unreasonable . . . ." S.S., 229 N.J. at 380. The divergent findings of fact and conclusions of law are not indicative of error by the court on remand.

We have considered the State's remaining arguments and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3940-23