NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1087-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARY MELLODY,

    Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **July 5, 2024** |
| **APPELLATE DIVISION** |

Argued May 8, 2024 – Decided July 5, 2024

Before Judges Currier, Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Municipal Appeal No. 04-03-22.

Nicole Leigh Atlak argued the cause for appellant (Caruso Smith Picini, PC, attorneys; Nicole Leigh Atlak, on the briefs).

Karen A. Lodeserto, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Carolyn Murray, Acting Sussex County Prosecutor, attorney; Karen A. Lodeserto, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

In this appeal we consider the circumstances in which a police officer may enter a suspect's residence in connection with a drunk or careless driving investigation. Under the Fourth Amendment and its analogue, Article I, Paragraph 7 of the New Jersey Constitution, homes are accorded heightened protections. While police have the authority to perform various "community caretaking" functions—such as determining whether a suspected drunk driver needs medical attention—they may not make a warrantless entry into a suspect's home, including the garage, to execute an investigative detention without consent or exigent circumstances.

Defendant Mary Mellody appeals from a November 18, 2022 Law Division order affirming, on de novo review, the denial of her motion to suppress evidence and her municipal court convictions for driving while intoxicated (DWI) and careless driving. Defendant contends there were insufficient grounds to initiate a DWI stop because the officer had not personally observed her alleged erratic driving. She also contends the results of the field sobriety tests should have been suppressed as fruits of the officer's unlawful entry into her garage at her home.

After carefully reviewing the record in light of the governing legal principles, we conclude the officer had reasonable and articulable suspicion to initiate a DWI stop based on a 9-1-1 call reporting defendant's erratic driving.

However, we also conclude the officer unlawfully entered defendant's garage to detain her. Viewed under an objective standard, the record shows the officer did not render emergency aid justifying the warrantless entry under the exigent circumstances exception. Rather, the officer conducted what might be characterized as a routine investigation of the suspected DWI and careless driving offenses, approaching the vehicle in the garage as if it were stopped on the side of a public road, and administering standard field sobriety tests without ever inquiring whether defendant needed medical attention.

Because the State failed to establish exigent circumstances, entering the garage to detain defendant was unlawful, and the fruits of the ensuing investigation must be suppressed. Therefore, we reverse and vacate defendant's DWI conviction, since the finding she was intoxicated depends on the field sobriety tests and observation of her demeanor made after the officer unlawfully entered the garage. We remand for the Law Division judge to determine whether the careless driving conviction—which is predicated on the way defendant drove into her garage—can be sustained based on information learned before the officer unlawfully crossed the threshold of defendant's home.

I.

We discern the following facts and procedural history from the record. On November 1, 2019, defendant went to a tavern in Hardyston, where she saw

her neighbor.  Defendant and the neighbor left the tavern separately around 10:30 p.m.  Around 10:44 p.m., Hardyston Police received a 9-1-1 call reporting an erratic driver in the Crystal Springs development area.  The caller reported that the driver was swerving and going over curbs and described the car as a black Jeep SUV.  The caller provided the Jeep's license plate number.

An officer was dispatched to the Jeep's registration address in an attempt to locate the erratic driver.  Upon his arrival, the officer observed a Jeep in the driveway matching the description from the 9-1-1 call.  The Jeep's brake lights were illuminated.

The officer activated his overhead lights to effectuate a stop.  The Jeep moved forward into the attached garage and stopped after the officer heard a "bang."  He surmised the Jeep struck a refrigerator located in the one-car garage, which he characterized as "tight."

The officer entered the garage and saw defendant sitting in the driver's seat.[1]  At the suppression hearing, the officer testified he asked defendant "what she was doing, why she didn't stop when [he] activated [his] lights."  He also "asked her something in relation to why she crashed into her fridge."  He noticed

---

[1] The patrol vehicle's mobile video recorder (dashcam) was not activated at this point in the encounter.  It was subsequently activated and recorded the field sobriety tests.

defendant's movements were "fumbled" and "slow" and that her eyes were "watery" and "bloodshot red." The officer smelled alcohol emanating from the vehicle.

The officer instructed defendant to turn off her engine and exit the vehicle so he could administer field sobriety tests. While performing the "walk and turn" test, defendant lost her balance and took an incorrect number of steps. She was also unable to perform the "one-leg stand" test.

Defendant was taken into custody and transported to the police station. She was charged with DWI, N.J.S.A. 39:4-50, careless driving, N.J.S.A. 39:4-97, and failure to comply with the direction of a police officer, N.J.S.A. 39:4-57.

A. MUNICIPAL COURT PROCEEDINGS

On December 9, 2021, a municipal court judge convened a hearing on defendant's motion to suppress evidence. The officer who initiated the stop and made the arrest was the only witness. The State also introduced portions of the 9-1-1 call and dashcam recordings.

The municipal court judge determined:

> [I]t is significant that when [the officer] arrives and puts on his lights that [defendant] then, while her car is operational drives into the garage and drives into a refrigerator. At this point, he doesn't—he's not sure what he's dealing [with] quite frankly, and I think he

has an obligation, quite frankly, to investigate. Not only because there's an indication that she's driving erratically, but there may be a medical issue at stake. And I think there's probably a community caretaker function that is invoked under these circumstances.

The judge continued:

If [defendant] was stopped in her vehicle, the vehicle's turned off and she exited her vehicle and went into her home I think under those circumstances the argument with respect to getting a search warrant has great validity. I think under those circumstance[s] . . . the police are obligated to get a search warrant. But not here. She's still in her car. The idea that she's not going anywhere, because that was an issue that was raised by [defense counsel], assumes that she's not going to back up, assumes she's not going to leave, and assumes that [the officer can tell her to stop.] Well, obviously that didn't work. When he put his lights on and she saw that [his] lights were on, and he activated some siren she then drove forward. I'm not going to say sped forward, but she drove forward and in such a way that she hit a . . . refrigerator.

The judge noted the dashcam video "speaks volumes" and "shows somebody who's clearly intoxicated." The judge described defendant as "wobbling," "zigzagging," and "crying . . . upset . . . [and] emotional." He further stated, "her speech is slurred."

The judge found the officer credible. Although the judge acknowledged there were issues with respect to what the officer recalled, he noted "this is a

ticket that's now two years old."  The judge denied defendant's motion to suppress.

The municipal court trial was convened on March 10, 2022.  The parties stipulated they would use the testimony from the suppression hearing.  The State's sole witness was the officer who administered the field sobriety tests and made the arrest.  The defense called defendant's neighbor as a witness.

The neighbor testified that defendant did not appear to be under the influence of alcohol or drugs at the tavern.  Further, the neighbor picked up defendant's towed car the next day and "didn't see a single scratch or a dent." She testified "[e]verything was intact."

Defendant testified on her own behalf.  She claimed she was in the process of parking her car, and that the refrigerator is located directly in front of it.  She maintained she did not hit the refrigerator or hear a "crash sound."  She did not see any damage on the refrigerator when she looked at it after the incident.

Defendant testified, "I was putting my car in park.  I noticed flashing lights behind me, but I honestly did not think that the [l]ights were at my house.  I thought they were at my neighbor's home."  She continued, "[T]he first experience that I had was the officer came into my garage and was banging on my window.  And startled me."  As to her performance on the field sobriety

A-1087-22

tests, defendant testified she has health issues that impacted her balance and ability to perform the tests.

At the close of testimony, defendant moved to dismiss the case, arguing the State did not prove the charged offenses beyond a reasonable doubt. The municipal judge denied the motion.

In rendering the verdict, the municipal judge found defendant's testimony to be "[t]ruly incredulous." The judge nonetheless dismissed the failure to comply with directions of a police officer charge.

The judge found defendant guilty of DWI based on the observational evidence of defendant's intoxication. The judge also found defendant guilty of careless driving "because the act of pulling that car forward under those circumstances, was done without due caution." With respect to the lack of refrigerator damage, the judge noted:

> Now, you know, is there damage to her car, is there damage to the refrigerator? I credit [the neighbor's] testimony that there was no damage. But that doesn't mean [defendant] didn't hit it . . . just because you hit something doesn't mean there's damage to your vehicle or to the . . . refrigerator.

Because this was defendant's second DWI conviction, she was sentenced to a two-year suspension of driving privileges, a two-year installation of an ignition interlock device after the driving suspension, forty-eight hours at the

Intoxicated Driver Resource Center (IDRC), thirty days community service, and fines and costs. Defendant appealed her convictions and sentence to the Law Division.

B. LAW DIVISION PROCEEDINGS

On October 26, 2022, a de novo hearing was convened in the Law Division. On November 18, 2022, the Law Division judge issued a written opinion upholding the convictions and sentence. With respect to the motion to suppress, the Law Division judge found the officer had reasonable and articulable suspicion to effectuate a stop of defendant's vehicle, citing to State v. Golotta, 178 N.J. 205 (2003). The judge determined "the 9-1-1 caller should not be treated as an anonymous tip based on the quality of information that he provided to the operator."

The judge also concluded the officer lawfully entered the garage, reasoning:

> The combination of the erratic driving report coupled with [d]efendant driving her car after the patrolman engaged his lights and siren and then running into a refrigerator all raise seri[ou]s concerns for the health, safety and welfare of the driver that necessitate follow up action. Here, [the patrolman] testified that he observed a crash and that he was not sure if the [d]efendant was okay or not which is why he entered the garage. These facts provided [the patrolman] with an "objectively reasonable basis to believe that a driver

may be impaired or suffering a medical emergency."
State v. Scriven, 226 N.J. [20,] 39 [2016].

Turning to the de novo review of the municipal court convictions, the Law Division judge determined the State proved defendant was guilty of DWI beyond a reasonable doubt based on the municipal court record. The judge viewed the dashcam video and found it corroborated the officer's description of defendant's demeanor. The judge concluded:

> [The patrolman] observed the [d]efendant crash her vehicle into the refrigerator. [The patrolman] further observed that the [d]efendant's movements were slow and fumbling; her speech was slow and slurred; and her eyes were bloodshot red and watery. Additionally, [the patrolman] smelled the odor of alcohol emanating from the [d]efendant's vehicle as she sat in it and the [d]efendant admitted to drinking two glasses of wine. Furthermore, when [the patrolman] attempted field sobriety tests on the [d]efendant, she was unable to follow instructions during the administration of the walk and turn test and she failed the one-legged stand test.

The Law Division judge also ruled the State proved defendant was guilty of careless driving beyond a reasonable doubt. The judge agreed with the municipal court that defendant engaged in careless driving when she pulled the car forward into the garage, finding "[d]efendant's intoxication rendered her incapable of driving with due caution and circumspection, as evidenced by [the

patrolman's] testimony that he heard and observed the [d]efendant crash her vehicle into the refrigerator in her garage."

This appeal follows.  Defendant raises the following contentions for our consideration:

> POINT I
>
> THE LAW DIVISION ERRED IN ITS LEGAL CONCLUSION THAT THE OFFICER HAD THE REQUISITE REASONABLE SUSPICION AND/OR ACTED PURSUANT TO THE COMMUNITY CARETAKER FUNCTION AS JUSTIFICATION FOR THE FOURTH AMENDMENT VIOLATION.
>
> POINT II
>
> THE LAW DIVISION ERRED IN ITS UNSUPPORTED RELIANCE UPON THE CREDIBILITY FINDINGS OF THE MUNICIPAL TRIAL COURT AND IN FAILING TO MAKE ITS OWN DETERMINATIONS AS TO THE CREDIBILITY OF TESTIMONIAL EVIDENCE PRESENTED.
>
> POINT III
>
> THE LAW DIVISION ERRED IN ADJUDICATING [DEFENDANT] GUILTY AS THE DETERMINATION WAS AGAINST THE WEIGHT OF THE CREDIBLE EVIDENCE.

## II.

When a defendant appeals a municipal court conviction, a Law Division judge conducts a de novo trial on the municipal court record.  R. 3:23-8(a)(2).

The Law Division judge must make independent findings of fact and conclusions of law but defers to the municipal court's credibility findings. State v. Robertson, 228 N.J. 138, 147 (2017); State v. Locurto, 157 N.J. 463, 474 (1999); see also State v. Kuropchak, 221 N.J. 368, 382 (2015).

In an appeal from a de novo hearing on the record, we do not independently assess the evidence. Locurto, 157 N.J. at 471. Rather, our review of a Law Division judge's decision is limited to determining whether the findings made by the judge "'could reasonably have been reached on sufficient credible evidence present in the record.'" Id. at 472 (quoting State v. Barone, 147 N.J. 599, 615 (1997)). "[T]he rule of deference is more compelling where . . . two lower courts have entered concurrent judgments on purely factual issues." Id. at 474; accord State v. Stas, 212 N.J. 37, 49 n.2 (2012). "Under the two-court rule, appellate courts ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error." Locurto, 157 N.J. at 474 (citing Midler v. Heinowitz, 10 N.J. 123, 128-29 (1952)). However, we owe no deference to the Law Division judge or the municipal court with respect to legal determinations. State v. Handy, 206 N.J. 39, 45 (2011) ("[A]ppellate review of legal determinations is plenary.") (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Similar principles limit the scope of our review of the search and seizure issues presented in this appeal. As a general matter, "[o]ur standard of review on a motion to suppress is deferential." State v. Nyema, 249 N.J. 509, 526 (2022). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Ahmad, 246 N.J. 592, 609 (2021) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We "defer[] to those findings in recognition of the trial court's 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Nyema, 249 N.J. at 526 (quoting Elders, 192 N.J. at 244). In contrast, the trial court's interpretation of the law and the legal "consequences that flow from established facts" are reviewed de novo. State v. Gamble, 218 N.J. 412, 425 (2014); accord State v. Smith, 212 N.J. 365, 387 (2012).

Turning briefly to substantive legal principles, "'[t]he Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures.'" State v. Smart, 253 N.J. 156, 164-65 (2023) (quoting Nyema, 249 N.J. at 527). One of the bedrock principles under both Constitutions is that warrantless searches and seizures are presumptively invalid. See State v.

Goldsmith, 251 N.J. 384, 398 (2022); see State v. Pineiro, 181 N.J. 13, 19 (2004). "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023), certif. denied, 255 N.J. 506 (2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)).

This fundamental principle applies to motor vehicle stops. In Nyema, our Supreme Court explained:

> When police stop a motor vehicle, the stop constitutes a seizure of persons, no matter how brief or limited. [Scriven, 226 N.J. [at] 33 []]. An investigative stop or detention, however, does not offend the Federal or State Constitution, and no warrant is needed, "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)).
>
> Although reasonable suspicion is a less demanding standard than probable cause, "[n]either 'inarticulate hunches' nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights." State v. Stovall, 170 N.J. 346, 372 (2002) (Coleman, J., concurring in part and dissenting in part) (quoting State v. Arthur, 149 N.J. 1, 7-8 (1997)); accord State v. Alessi, 240 N.J. 501, 518 (2020). Determining whether reasonable and articulable suspicion exists for an

investigatory stop is a highly fact-intensive inquiry that demands evaluation of "the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)).

[Nyema, 249 N.J. at 527-28.]

The same reasonable and articulable suspicion standard that applies to a "Terry" stop to investigate suspected criminal activity also applies to stops based on suspected motor vehicle offenses. See Delaware v. Prouse, 440 U.S. 648 (1979) (holding motor vehicle stops must be based on reasonable and articulable suspicion to believe the vehicle is being operated in violation of law, typically, an observed motor vehicle violation).

The vast majority of motor vehicle stops are conducted on public roads. In this instance, the stop was initiated in defendant's driveway. The ensuing investigation moved into her garage when she pulled into it and the officer followed her inside on foot. Location matters. The constitutional rules of engagement are especially strict when a police investigation intrudes on a private residence. In State v. Vargas—a case we carefully analyze later in this opinion—our Supreme Court invoked the often-repeated maxim, "[i]ndeed, 'physical entry of the home is the chief evil against which the wording of the

Fourth Amendment is directed.'" 213 N.J. 301, 313 (2013) (quoting United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div., 407 U.S. 297, 313 (1972).

### III.

With those general principles in mind, we first address defendant's contention that the officer did not have a lawful basis to initiate a stop of her vehicle, which was stationary in her driveway before the officer made any observations of erratic driving.[2] We are unpersuaded by defendant's argument. The report made by the 9-1-1 caller was sufficiently detailed to provide reasonable and articulable suspicion to justify a stop. Although the officer never personally observed the vehicle operate erratically on a public roadway, he was able to corroborate the 9-1-1 call by confirming the vehicle bearing the license plate provided by the caller also met the description of the Jeep given by the

---

[2] Defendant did not argue before the municipal court or Law Division judge, and does not argue on appeal, that the officer breached the "curtilage" of her home by entering onto her driveway. See State v. Domicz, 188 N.J. 285, 302 (2006) ("Curtilage is land adjacent to a home and may include walkways, driveways, and porches. Whether the Fourth Amendment safeguards an area of curtilage depends on a consideration of various factors.") (citation omitted)); see Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available."); see also Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

caller. Furthermore, observing the vehicle in the driveway with its brake lights on permits a reasonable inference it had very recently been operating on a public road, again corroborating the 9-1-1 caller's report. Together, these facts satisfy the test for initiating an investigative detention.

As the Law Division judge correctly noted, this case is governed by the principles established by our Supreme Court in Golotta, 178 N.J. at 205, which distinguishes 9-1-1 callers from other anonymous sources. See Alabama v. White, 496 U.S. 325 (1990) (holding as a general proposition, an anonymous tip by itself is not sufficient to constitute a reasonable and articulable suspicion); see also State v. Rosario, 229 N.J. 263 (2017) (reaffirming that an anonymous tip, standing alone, inherently lacks the reliability necessary to support reasonable and articulable suspicion because the tipster's veracity is largely unknown, and unknowable).

In Golotta, the police received a 9-1-1 call from "a citizen informant" reporting a pickup truck driving erratically. 178 N.J. at 209. The caller described the vehicle, including its license plate number, and indicated the direction the truck was traveling. Ibid. The caller's name was not obtained. Id. at 209-10.

The 9-1-1 dispatcher relayed the information to two officers on patrol. Id. at 209. The officers identified the pickup truck and initiated a stop, even though

they had not personally observed any erratic movements. Id. at 210. The driver submitted to a breathalyzer test and was charged with DWI. Ibid. The defendant moved to suppress the breath test results. Ibid. He "argued that by not observing the alleged erratic driving, the officer had lacked sufficient suspicion to stop the vehicle and, as a result, any evidence gathered after that juncture was inadmissible." Ibid.

In rejecting the defense contention, our Supreme Court held:

> We agree with those courts that have reduced the degree of corroboration necessary to uphold a stop of a motorist suspected of erratic driving in these circumstances. Similar to the reasoning of those courts, our rationale is threefold. First, by its nature, a call placed and processed via the 9-1-1 system carries enhanced reliability not found in other contexts. Second, the conduct at issue is the temporary stop of a motor vehicle based on reasonable suspicion, not the more intrusive search of its contents or arrest of its driver, which would be governed by different rules. Third, an intoxicated or erratic driver poses a significant risk of death or injury to himself and to the public and, as such, that factor is substantial when evaluating the reasonableness of the stop itself.
>
> [Id. at 218.]

Since Golotta was decided, the United States Supreme Court also embraced the distinction between 9-1-1 callers and other anonymous tipsters. See Navarette v. California, 572 U.S. 393 (2014). In Navarette, the Court upheld a traffic stop based on an anonymous 9-1-1 call, holding police had reasonable

and articulable suspicion to stop the defendant's vehicle for DWI where the 9-1-1 caller provided an eyewitness account and the call was made shortly after the incident. Id. at 398-400. The Court noted that "a reasonable officer could conclude that a false tipster would think twice before using [the 9-1-1 system]" given "technological and regulatory developments." Id. at 402.

Defendant argues that Golotta does not apply in the present circumstances because our Supreme Court contemplated motor vehicle stops on public roads, not stops where police intercept the subject vehicle on private property. We are not persuaded by the distinction defendant asks us to draw. Nothing in the rationale undergirding the Golotta holding limits its reach based on whether the subject vehicle has reached its destination. The gravamen of Golotta—and now Navarette—is that information provided by 9-1-1 callers is inherently more reliable than information provided by other unknown informers. These decisions thus augment the general rule that "an anonymous tip, standing alone, inherently lacks the reliability necessary to support reasonable suspicion." Rosario, 229 N.J. at 276.

Nor are we persuaded by defendant's fact-sensitive contention the State failed to present evidence concerning the specific registration details of the

vehicle observed by the 9-1-1 caller.[3]  That contention is belied by the record and the reasonable inferences that can be drawn from the record.  It is obvious the 9-1-1 caller provided the license plate number of defendant's vehicle, otherwise, the officer could not have driven to the specific address associated with her vehicle's registration.  Furthermore, the officer testified in pertinent part:

> OFFICER:  The dispatcher sent me to Warren Circle for an erratic driver complaint.
>
> . . . .
>
> PROSECUTOR:  Okay, but you were told Warren Circle, specifically the address?
>
> OFFICER:  The address and also the vehicle's registration was provided to me.

In sum, the information provided by the 9-1-1 caller and forwarded to the patrol officer by the police dispatcher was comparable to the information found to constitute reasonable and articulable suspicion in Golotta.  Accordingly, the officer had a sufficient basis to initiate a stop to investigate the erratic driving reported by the 9-1-1 caller.

IV.

---

[3]  Defendant contends, "the record is barren of any specific 'registration' details or license plate information pertaining to the subject vehicle of the [9-1-1] call."

We turn next to defendant's contention the municipal court and Law Division judges overextended the community caretaking doctrine by relying on it to justify police entry into her garage. The Law Division judge expressly relied on our Supreme Court's decision in Scriven to support his finding that the officer "was not sure if the [d]efendant was okay" after he "observed a crash," adding that "running into a refrigerator . . . raise[d] [serious] concerns for the health, safety and welfare of the driver that necessitate[d] follow up action." The judge concluded those concerns provided an "'objectively reasonable basis to believe that a driver may be impaired or suffering a medical emergency.'" (quoting Scriven, 226 N.J. at 39).

The judge's reliance on Scriven is misplaced. Scriven dealt with community caretaking in the context of a roadside encounter. See id. at 27. It did not address the qualitatively distinct privacy intrusion that attends police entry into a private residence. Specifically, the Scriven Court held, "[i]n their community-caretaker role, police officers, who act in an objectively reasonable manner, may check on the welfare or safety of a citizen who appears in need of help on the roadway without securing a warrant or offending the Constitution." Id. at 38 (emphasis added). The Court further explained, "Police officers who have an objectively reasonable basis to believe that a driver may be impaired or

21

suffering a medical emergency <u>may stop the vehicle</u> for the purpose of making a welfare check and rendering aid, if necessary." <u>Id.</u> at 39 (emphasis added).

<u>Scriven</u> did not address "welfare checks" made in private residences. This distinction is critical. The rules governing the community caretaking doctrine are very different for homes as compared to vehicles, as made clear in other State and federal precedents.

To provide a foundation for the remainder of our analysis of the community caretaking doctrine's boundaries, we take a step back to acknowledge the distinctive protections accorded to private residences by the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution. In <u>Florida v. Jardines</u>, the United States Supreme Court affirmed that the '"very core'" of the Fourth Amendment is "'the right of a [person] to retreat into [their] own home and there be free from unreasonable governmental intrusion.'" 569 U.S. 1, 6 (2013) (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961)).

In <u>State v. Evers</u>, our Supreme Court stressed, "[t]he privacy interests of the home are entitled to the highest degree of respect and protection in the framework of our constitutional system." 175 N.J. 355, 384 (2003). Applying this core Fourth Amendment principle, in <u>New York v. Payton</u>, the United States Supreme Court held that police cannot make a routine felony arrest in the

arrestee's own home without an arrest warrant or an exception to the warrant requirement, such as exigent circumstances.  445 U.S. 573, 589-90 (1980).

The special protections accorded to the home apply to defendant's garage. The attached garage is part of her home, or at the very least, part of the home's protected curtilage.  For constitutional privacy analysis purposes, a garage is not just a place to shelter vehicles from the elements.  Personal "effects" protected under the literal terms of the Fourth Amendment and Article I, Paragraph 7[4] might as easily be stored in a garage as in a basement, an attic, or, for that matter, a bedroom walk-in closet.  In this instance, the record shows defendant kept a refrigerator in her garage.

It makes no difference, moreover, that the garage door was open when the officer crossed the threshold.  A large open door does not invite police to enter a garage without a warrant or recognized exception to the warrant requirement any more than an open sliding-glass patio or lanai door invites police to enter a

---

[4]  Article I, Paragraph 7 of the New Jersey Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.

family room. While an open door may, depending on fact-sensitive circumstances, expose to "plain view" certain contents of a garage, even then, police may not enter the garage based solely on the plain view observation of contraband inside. See State v. Johnson, 476 N.J. Super. 1, 21 (App. Div. 2023) ("[T]he plain view exception does not authorize police to cross the threshold of a constitutionally protected place. The plain view doctrine does not apply, for example, when the officer has no right to enter a private residence.") (citing State v. Lewis, 116 N.J. 477, 485 (1989)).

Nor does it matter that the officer acted in good faith and may not have appreciated that entering the open garage was an act of constitutional significance qualitatively different from walking up to a vehicle stopped on the highway. We focus solely on the officer's conduct, not his or her subjective thoughts. See Terry, 232 N.J. at 245-46; cf., State v. Ravotto, 169 N.J. 227, 237 (2001) (holding, in the context of drawing blood for blood alcohol content testing, "[b]ecause the test is an objective one, '[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional'") (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). In State v. Novembrino, 105 N.J. 95, 157-58 (1987), our Supreme Court, relying on Article I, Paragraph 7, firmly rejected a "good faith exception" to the

exclusionary rule. And recently, in <u>State v. Smith</u>, our Supreme Court reaffirmed that "an investigative stop 'may not be based on . . . the officer's subjective good faith.'" 251 N.J. 244, 258 (2022) (quoting <u>Chisum</u>, 236 N.J. at 546).

We add that this was not a fleeting or de minimus entry into defendant's home. Here, the officer entered the garage to execute an investigative detention, that is, to seize defendant. <u>See</u> <u>ibid.</u> (noting a motor vehicle stop, "no matter how brief or limited" is a seizure of a person). Even a brief entry of a home to effectuate the seizure of a resident is a significant constitutional intrusion.

In <u>Payton</u>, the United States Supreme Court held "the warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable." 445 U.S. at 585. The Court ultimately ruled the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." <u>Id.</u> at 576.

The home-protection rationale underlying the <u>Payton</u> rule logically applies as well to investigative detentions. Although an arrest is "the most significant type of seizure by police." <u>Rosario</u>, 229 N.J. at 272, an investigative detention is also "a species of seizure required by the [Fourth] Amendment to be reasonable." <u>Payton</u>, 445 U.S. at 586; <u>see</u> <u>Terry v. Ohio</u>, 392 U.S. at 21; <u>see also</u> <u>Smith</u>, 251 N.J. at 258. We therefore hold the same home-protection

principle that undergirds <u>Payton</u> prohibits police from making a warrantless and nonconsensual entry into a suspect's home to effectuate a routine investigative detention.  Put another way, police cannot conduct a warrantless entry into a home to detain a resident without consent or a recognized exception to the warrant requirement, such as exigent circumstances.

V.

That brings us to our Supreme Court's decision in <u>Vargas</u>, which addressed "whether the community-caretaking doctrine authorizes the police to conduct a warrantless entry and search of a home to check on the welfare of a resident in the absence of the resident's consent or an objectively reasonable basis to believe that there is an emergency."  213 N.J. at 305.  The Court concluded, "[w]e now hold that, based on the United States Supreme Court's and this Court's jurisprudence, the community-caretaking doctrine is not a justification for the warrantless entry and search of a home in the absence of some form of an objectively reasonable emergency."  <u>Ibid.</u>

The <u>Vargas</u> Court carefully examined the origins and rationale of the community caretaking doctrine, which was developed to apply to vehicles.  The Court noted that in <u>State v. Edmonds</u>, 211 N.J. 117, 143 (2012), it "articulated limits to the community-caretaking doctrine in the context of a home search."  <u>Vargas</u>, 213 N.J. at 320.  In <u>Edmonds</u>, the Court stressed the community-

caretaking doctrine is "not a roving commission to conduct a nonconsensual search of a home in the absence of exigent circumstances." 211 N.J. at 143.

Importantly, for purposes of the present appeal, the <u>Vargas</u> Court commented, "[t]he present case comes before us because our state case law has blurred the distinction between the community-caretaking and emergency-aid doctrines. We now must bring clarity to our jurisprudence." <u>Id.</u> at 323. To that end, the Court explained:

> Police officers perform both law enforcement and community-caretaking functions. When they are engaged in either activity, they must conform to the dictates of the Constitution. The right of privacy in the sanctuary of one's home is protected whether a government officer is acting in a law enforcement or community-caretaking capacity.
>
> [<u>Id.</u> at 328-29.]

At bottom, the <u>Vargas</u> Court "decline[d] the State's invitation to expand the [community caretaking] doctrine in a way that was never conceived by the United States Supreme Court." <u>Id.</u> at 321. "Without the presence of consent or some species of exigent circumstances," the Court stressed, "the community-caretaking doctrine is not a basis for the warrantless entry into and search of a home." <u>Ibid.</u>

The same reasoning that buttresses <u>Vargas</u> was subsequently embraced by the United States Supreme Court in <u>Caniglia v. Strom</u>, 593 U.S. 194 (2021). In

Caniglia, the Court acknowledged that police officers are often called upon to discharge noncriminal "'community caretaking functions.'" Id. at 196 (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). The Court framed—and definitively answered—the issue before it as whether "these 'caretaking' duties create[] a standalone doctrine that justifies warrantless searches and seizures in the home. It does not." Ibid. The Court emphasized that its previous recognition "that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." Id. at 199.

In sum, after Vargas and Caniglia, it is clear that under both the Fourth Amendment and Article I, Paragraph 7, performing a community caretaking function does not constitute a standalone exception to the warrant requirement for purposes of authorizing police to enter a private residence. Rather, any such warrantless, nonconsensual entry is justified, if at all, only under the exigent circumstances exception.

## VI.

We therefore turn our attention to the exigent circumstances exception, which is comprised of several analytically distinct varieties. As our Supreme Court explained in State v. Zalcberg:

> There is no defined formula for determining whether there are exigent circumstances, and the term may take on different shape and form depending on the facts of a given case. State v. DeLuca, 168 N.J. 626, 632 (2001). Absent a precise definition, applying the exigency doctrine "demands a fact-sensitive, objective analysis" based on the totality of the circumstances. Ibid.
>
> [232 N.J. 335, 345 (2018).]

Over the years, the United States and New Jersey Supreme Courts have identified several classifications of exigency that fall under the rubric of the exigent circumstances exception. These include, for example, hot pursuit of a fleeing felon, see State v. Bolte, 115 N.J. 579 (1989), and preventing the imminent destruction of evidence, including blood alcohol content evidence, see Zalcberg, 232 N.J. at 335. In the matter before us, the State does not argue hot pursuit or the need to prevent the destruction of evidence. Rather, the State contends the entry into defendant's garage was lawful because the officer needed to determine whether the driver required "emergency aid," which is another well-delineated species of exigent circumstances.

In Vargas, our Supreme Court explained that:

> Under the emergency-aid doctrine, a police officer can enter a home without a warrant if [they have] "'an objectively reasonable basis to believe that an emergency requires that [police] provide <u>immediate assistance to protect or preserve life, or to prevent serious injury</u>'" and there is a "'reasonable nexus

between the emergency and the area or places to be searched.'"

[213 N.J. at 323 (emphasis added) (citing Edmonds, 211 N.J. at 132) (quoting State v. Frankel, 179 N.J. 586, 600 (2004)).]

In Edmonds, the Court stressed both the seriousness and imminency of the danger to life and limb that is required to satisfy the emergency-aid species of exigent circumstances, explaining:

In sum, if police officers "possess an objectively reasonable basis to believe" that prompt action is needed to meet an imminent danger, then neither the Fourth Amendment nor Article I, Paragraph 7 demand that the officers "delay potential lifesaving measures while critical and precious time is expended obtaining a warrant."

[211 N.J. at 133 (emphasis added) (quoting Frankel, 179 N.J. at 599).]

In State v. Garbin, we upheld the defendant's DWI conviction, concluding the warrantless entry into a home garage was lawful under the community caretaking doctrine. 325 N.J. Super. 521, 526-27 (App. Div. 1999). We did not then have the benefit of later New Jersey and United States Supreme Court decisions that clarify in the context of a home entry, the community caretaking doctrine is not a standalone exception to the warrant requirement. Our decision in Garbin nonetheless demonstrates the type and degree of emergency that is

needed to justify a warrantless entry into a garage for community caretaking purposes.

In Garbin, an officer was dispatched to the defendant's home "to investigate a report of a possible fire." Id. at 524. When the officer arrived, he smelled burning rubber and noticed smoke coming from the defendant's garage. Ibid. The garage door started to open, closed, then opened all the way up. Ibid. The officer saw a person sitting in the driver's seat of a pickup truck. Ibid. The door closed again. Ibid. The officer "pounded on the garage door and said, 'police department, open up the door.'" Ibid. When the door opened, the two officers entered and observed "tires of defendant's truck spinning, creating smoke, and the front bumper pushing against the rear of the garage." Ibid. On those facts, we held:

> [The officers'] observations of smoke emanating from the garage and the wheels of defendant's truck rapidly spinning provided a reasonable basis for concern that there was something wrong with the vehicle or its driver. Those observations could have indicated that the car was stuck in a driving gear, that the driver was unconscious or attempting to commit suicide or, as turned out to be the case, that he was highly intoxicated. Under these circumstances, the police officers would have been remiss in the performance of their community caretaking responsibilities if they had failed to investigate further.
>
> [Id. at 526-27.]

VII.

It remains for us to apply the foregoing legal principles to the facts of the present matter. As we have noted, the Law Division judge concluded the combination of circumstances "raise[d] [serious] concerns for the health, safety and welfare of the driver that necessitate[d] follow up action." The judge also found that the officer "was not sure if [] [d]efendant was okay or not which is why he entered the garage." These facts, the judge concluded, provided the officer with an objectively reasonable basis to believe defendant "may be impaired or suffering a medical emergency."

While we defer to the judge's credibility assessment and fact-finding, we view the determination of whether those facts established an emergency sufficient to satisfy the emergency-aid doctrine to be a legal conclusion to which we owe no special deference and instead review de novo. See Gamble, 218 N.J. at 425 ("A trial court's interpretation of the law, however, and the consequences that flow from established facts are not entitled to any special deference.").

In conducting our review, we focus on the officer's conduct—rather than his subjective beliefs—as required by Edmonds. 211 N.J. at 132. There, our Supreme Court admonished, "we do not believe that the elusive attempt to plumb the subjective motivations of an officer will meaningfully advance either the

privacy interests of an individual or the ultimate determination of whether a particular search or seizure was unreasonable under state law." Id. at 133.

Although we do not have the benefit of a dashcam recording of the initial stages of the encounter between the officer and defendant, the officer's testimony, found to be credible by two judges, does not suggest he acted with any special urgency consistent with rendering emergency aid. See Locurto, 157 N.J. at 474. To the contrary, his testimony suggests he approached defendant's stationary (but running) vehicle in much the same way an officer would approach any vehicle stopped on a roadway on suspicion of drunk driving.

Importantly, the officer did not begin the encounter by asking defendant if she needed medical assistance, either because of a medical condition explaining her erratic driving, or because of injury resulting from the "crash" into the refrigerator.[5] Indeed, so far as the record before us shows, at no time during the encounter was defendant asked if she was alright. The officer testified as follows with respect to his actions after he activated his overhead lights and the Jeep struck the refrigerator:

---

[5] We note the impact with the refrigerator as described by the officer was not of a nature that would produce injury, much less serious injury. Nothing in the encounter—including the administration of the field sobriety tests—suggests the officer had an objectively reasonable basis to believe defendant had been injured by the impact.

PROSECUTOR: And did you get out of your patrol car?

OFFICER: Yes.

PROSECUTOR: And did you make contact with the person [who was] operating the vehicle?

OFFICER: Yes.

PROSECUTOR: And who was that?

OFFICER: [Defendant.]

. . . .

PROSECUTOR: And after you observed this—you made contact with her. Where did you make contact with her?

OFFICER: Inside the garage, she was sitting in her vehicle still.

PROSECUTOR: And did . . . you have a conversation with her?

OFFICER: Yes.

PROSECUTOR: And what was that conversation?

OFFICER: Well, I had asked her what she was doing, why she didn't stop when I activated my lights. And I asked her something in relation to why she crashed into her fridge.

PROSECUTOR: Did she answer you?

OFFICER: I don't recall exactly what—what she said.

PROSECUTOR: And did you—you don't recall what she said, but was the vehicle still on when you made contact with defendant?

OFFICER: Yes.

PROSECUTOR: And did you eventually tell her to turn the car off?

OFFICER: I did, yes.

PROSECUTOR: And so after you made contact with her do you recall—you had a conversation with her what did you do?

OFFICER: I informed her of the complaint received. And asked her why she did not stop, why she crashed into her fridge. And then I asked her to exit her vehicle.

PROSECUTOR: And she exited her vehicle?

OFFICER: Yes.

The officer's account does not suggest he rendered "immediate" assistance as contemplated in <u>Vargas</u>. 213 N.J. at 323. Rather, his candid testimony shows he entered the garage to conduct a DWI and careless driving investigation. We therefore hold that on this record, applying an objective test, the State failed to prove by a preponderance of the evidence that the officer lawfully entered the garage to render emergency aid. Because the warrantless, nonconsensual entry into the garage portion of the private residence does not satisfy the exigent circumstances exception, the entry was unlawful.

## VIII.

We next consider the appropriate remedy for the constitutional violation, and its impact on defendant's two convictions. "Under the exclusionary rule, evidence obtained in violation of an individual's constitutional rights will be excluded as 'fruit of the poisonous tree.'" State v. Roman-Rosado, 462 N.J. Super. 183, 197 (App. Div. 2020) (quoting State v. Faucette, 439 N.J. Super. 241, 266 (App. Div. 2015)). "Those 'fruits' include not only 'tangible materials' seized, but also 'testimony as to matters observed' in the course of a Fourth Amendment violation." State v. Badessa, 185 N.J. 303, 311 (2005) (quoting Wong Sun v. United States, 371 U.S. 471, 485 (1963)). "Even evidence indirectly acquired by the police through a constitutional violation is subject to suppression." Ibid.

The field sobriety tests and the officer's electronically recorded observation of defendant's physical appearance and demeanor occurred after the unlawful entry. Thus, they are fruits of that constitutional violation and must be suppressed. Accordingly, we reverse and vacate defendant's DWI conviction.

The careless driving violation, in contrast, was committed by defendant and observed by the officer before he entered the garage. In reaching its de novo decision on this offense, however, the Law Division judge not only considered the officer's testimony "that he heard and observed [] [d]efendant crash her

vehicle into the refrigerator," but also considered evidence of her inebriation learned after the unlawful entry. Specifically, the judge found "[d]efendant's intoxication rendered her incapable of driving with due caution and circumspection."

Because the evidence of defendant's intoxication arose after the officer unlawfully entered the garage, it cannot be considered in rendering a decision on the careless driving charge. We remand for the Law Division judge to determine whether the evidence developed before the unlawful entry was sufficient to establish beyond a reasonable doubt that defendant committed careless driving. If the Law Division judge finds the evidence obtained before the unlawful entry is not sufficient to establish guilt beyond a reasonable doubt, the judge shall vacate the careless driving conviction.

IX.

Because we remand for the Law Division judge to reconsider the careless driving conviction, we briefly address defendant's contentions the Law Division judge erred by relying on the municipal court's credibility findings and by failing to make his own determinations. The gravamen of defendant's fact-sensitive argument is that the officer was not in a position to see and hear the impact with the refrigerator, and that the State introduced no evidence establishing the refrigerator or Jeep were damaged to verify the impact occurred. Relatedly,

defendant notes the dashcam was not activated at the outset of the encounter, further undermining the officer's credibility that he perceived a crash inside the garage. Thus, defendant argues, the Law Division judge should not have accredited the fact and credibility findings of the municipal court judge.

We reject that argument. The Law Division judge acted well within his discretion in accepting the municipal court's credibility findings with respect to the officer's testimony. See Robertson, 228 N.J. at 147 ("It is well-settled that the [Law Division] judge 'giv[es] due, although not necessarily controlling, regard to the opportunity of the' municipal court judge to assess 'the credibility of the witnesses.'") (quoting State v. Johnson, 42 N.J. 146, 157 (1964)).

Finally, in light of our decision to vacate the DWI conviction and remand for reconsideration of the careless driving conviction, we need not address defendant's contention the guilty verdicts were against the weight of the evidence.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office

CLERK OF THE APPELLATE DIVISION

A-1087-22