**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0409-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KEVIN J. CORKIN,

     Defendant-Appellant.

_____

Argued October 15, 2025 – Decided November 14, 2025

Before Judges Rose and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 22-04-0395.

Paul B. Brickfield (Paul B. Brickfield, PC) argued the cause for appellant.

Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sarah D. Brigham, of counsel and on the brief; William Stevens, Deputy Attorney General, on the brief).

PER CURIAM

Following denial of his suppression motion, defendant Kevin J. Corkin pled guilty to fourth-degree criminal trespass, N.J.S.A. 2C:18-3(a), charged in a four-count Bergen County indictment, and driving while intoxicated (DWI), N.J.S.A. 39:4-50, charged in a motor vehicle summons. Defendant was sentenced in accordance with the terms of the negotiated plea agreement to a 180-day jail term as a condition of a two-year probationary term on the trespass conviction and a concurrent 180-day jail term plus fines, costs, and penalties on the DWI conviction. On the State's motion, the court dismissed the remaining counts of the indictment and the moving violations. At the conclusion of the sentencing hearing, defendant surrendered his driver's license, but the custodial portion of his sentence was stayed pending the outcome of this appeal. A September 30, 2024 judgment of conviction memorialized the disposition.

In his merits brief on appeal, defendant raises a single point reprising his argument before the motion judge:

> THERE WAS NO ARTICULABLE REASONABLE BASIS TO STOP THE VEHICLE THAT [DEFENDANT] WAS DRIVING.

In reply to the contentions raised in the State's responding brief, defendant raises an additional point:

> THE STATE WAIVED THE ARGUMENT THAT THE ATTENUATION DOCTRINE APPLIES BY

FAILING TO RAISE IT BEFORE THE TRIAL COURT BELOW AND CANNOT NOW ARGUE IT NOW FOR THE FIRST TIME ON APPEAL. ALTERNATIVELY, [DEFENDANT]'S ACTIONS DID NOT DISSIPATE THE TAINT OF THE UNLAWFUL STOP.
(Not raised below)

Although not expressly stated in his reply point heading, defendant further argues the State belatedly claims when police stopped his car they had a reasonable articulable belief the vehicle was stolen.

Discerning no error in the motion judge's conclusion that police had reasonable suspicion to conduct the motor vehicle stop based on the totality of the circumstances, we affirm the December 7, 2023 order denying defendant's motion to suppress the stop of his car.

I.

We summarize the pertinent facts and procedural history from the testimony adduced at the one-day suppression hearing. During the hearing, the State presented the testimony of Sergeant Vincent Callan, a twenty-two-year veteran of the Rutherford Police Department (RPD). The State moved into evidence the footage of RPD Officer Travis Ritter's body-worn camera (BWC), which recorded defendant's statement to police at headquarters, and Callan's

3

BWC, which recorded the motor vehicle stop. Defendant did not testify or present any evidence.

Callan testified, as a patrol officer, he "handled day-to-day calls" and "[a]s a sergeant [he] oversee[s] the day-to-day calls." He was trained in the detection of impaired drivers. Of the hundreds of motor vehicle stops Callan conducted, about twenty were for DWI.

Around 8:17 p.m., on November 21, 2021, the RPD received a call from a homeowner, who reported an intruder was asleep in her upstairs bedroom. RPD Officers Katherine Caliennie and Ritter responded to the scene. Callan arrived two minutes later. He recognized defendant and the car parked on the street outside the victim's home from "prior engagements with [defendant]." Callan stated he knew defendant resided in North Arlington and the car was registered to his mother. Police arrested defendant for criminal trespass and transported him to headquarters, located about "three blocks" from the scene. Callan later testified defendant's car remained parked outside the residence.

Callan described defendant's demeanor at headquarters as "quiet" but "agitated." Callan detected alcohol on defendant's breath. Based on his training and experience, and his observations of defendant, Callan believed defendant was intoxicated. Defendant denied driving. Police offered to drive defendant

A-0409-24

home or call a ride share, and suggested he call a friend to pick up his car and take him home.

According to Ritter's BWC footage, defendant replied, "I'm getting picked up – I can't drive that car. I'm getting picked up and (indiscernible)." The BWC footage further reveals Callan offered to call defendant's brother to pick up the car after explaining to defendant, "I looked in with my flashlight through the window and could see the key fob in the center of the coffee cup and you have money all over it. If somebody goes and pulls the handle tonight, they're going to rob the car, they're going to steal the car."

The following exchange was captured on Ritter's BWC footage:

[]RITTER: You know you can't drive, right? You're not in the condition to drive, right?

[DEFENDANT]: Are you going to release me?

[]RITTER: Yeah, but I'm just saying you're not in the condition to drive.

[DEFENDANT]: I'm getting picked up. Thank you for your safety and your concern. I appreciate that.

[]RITTER: I'm not (indiscernible) I don't want you to get hurt or hurt somebody else. You know what I mean?

[DEFENDANT]: I understand and I am not (indiscernible).

5

A-0409-24

[]RITTER:  You're not incapacitated right now, so like, you know, you're not -- you have your aware with all [sic], you just -- you're just not under [sic] the condition to drive.  There is nothing wrong with being drunk, you just can't drive. . . .

Around 10:42 p.m., defendant was released from police custody.  Callan testified, defendant "was not a danger to himself so we were under no obligation . . . to bring him to the hospital or make him get somebody to pick him up."  He further explained, conversely, "[u]nder ATRA,[1] if they're a danger to themselves, we bring them to the emergency room until they sober up."  Accordingly, police permitted defendant to walk out of headquarters on his own accord.

Immediately thereafter, Callan returned to the victim's residence to ensure defendant did not return.  Callan stated, around 11:03 p.m., he saw the brake lights activate on defendant's car, which then "pull[ed] away."  Callan acknowledged he did not see defendant enter the car.  Callan did not see "anyone else in the car at that time."

Callan followed the car.  He did not observe any motor vehicle violations.  But after he "clos[ed] the distance" between his patrol vehicle and defendant's

---

[1]  Alcoholism Treatment and Rehabilitation Act, N.J.S.A. 26:2B-1 to -40.

car, Callan "activat[ed] [his] emergency lights and sirens" because "[defendant] was impaired at the station and [Callan] assumed it was him driving the vehicle."

Defendant did not immediately pull over. Callan "paced" the car "at sixty miles per hour" in a twenty-five-mile-per-hour residential zone. Callan pursued the car for about four or five minutes, over a half-mile stretch, until defendant stopped at a red light.

According to Callan's BWC footage, defendant told Callan he "literally just left." Callan asked, "what did I tell you before you left?" Defendant responded "[h]ow am I not fine to drive?" In response to Callan's declaration, "[y]ou were under the influence," defendant responded "[y]eah, four hours ago."

Callan testified he detected an odor of alcohol on defendant's breath and believed "defendant was still intoxicated to the point where he couldn't operate a vehicle." Defendant refused field sobriety tests.

According to Callan's BWC footage, while speaking with another officer, Callan noted he "c[ould] smell something coming off [defendant's] breath that possibly could be an alcohol beverage." Callan also stated "[defendant]'s much better than when [w]e had him before, but I think we would have to call the [drug recognition expert]." In his testimony, Callan clarified based on his training and experience, "[defendant] still appear[ed] to be under the influence

A-0409-24

of alcohol or . . . something."  To support his conclusion, Callan explained defendant "was so irate" and his breath emitted the smell of alcohol.  While not "as impaired as he was earlier," Callan believed defendant "was still impaired."

Defendant was arrested and transported to headquarters.  He refused to submit to an Alcotest.  He was charged with several violations, including DWI, and detained in the county jail.

On cross-examination, Callan acknowledged when defendant was arrested in the bedroom of the victim's home, Callan did not observe liquor bottles in defendant's vicinity.  Callan further stated, although he believed defendant was intoxicated when arrested for criminal trespass, and he knew the car parked outside the home was defendant's, Callan did not charge him with DWI because he believed he could not establish defendant operated the vehicle.

Callan also acknowledged, following his arrest for criminal trespass, defendant was in police custody for "two hours and fifteen minutes, not an hour and a half" as he testified on direct examination.  Callan further confirmed, based on his experience, "there was no danger whatsoever for [defendant] to just walk out the door on his own."  Callan later clarified "[defendant] wasn't incapacitated, so that's why he was released."  He reiterated "[police] felt he wasn't a danger to himself" and they told defendant "not to drive."  Callan

A-0409-24

acknowledged, after defendant was released from custody on the trespass charge, he was "feeling better, talking better, acting better."

In his closing remarks, defense counsel argued police lacked reasonable articulable suspicion to stop defendant's car. Citing the timeline, defense counsel emphasized police released defendant two hours and fifteen minutes after "[t]hey believed they smelled alcohol on his breath." Yet, "[t]wo minutes later" police arrested defendant for DWI. Counsel rhetorically asked how that could be possible when police "let him go because they felt he was okay." Counsel also questioned Callan's testimony that police were required to observe an individual operating a vehicle to charge DWI. Counsel further asserted police did not know defendant was the driver until they stopped the car.

Citing our Supreme Court's decision in State v. Atwood, 232 N.J. 433, 448 (2019), the State countered the level of suspicion necessary for a motor vehicle stop "is a relatively low burden." Summarizing Callan's testimony, the State argued based on the totality of the circumstances, police met that burden. Pertinent to this appeal, the State did not assert the stop was otherwise supported by the attenuation doctrine or police thought the car might have been stolen.

The motion judge reserved decision. Thereafter, both parties filed

A-0409-24

supplemental briefs.[2]  On December 7, 2023, the judge issued a cogent written decision and memorializing order, denying defendant's motion.

In his written decision, the judge squarely addressed the issues raised in view of the governing law and the evidence adduced at the hearing.  The judge also noted the arguments raised in the State's post-hearing supplemental brief: defendant committed motor vehicle violations and eluding in Callan's presence and the validity of those charges "d[id] not necessarily depend on the legality of the stop"; and "Callan also had reasonable suspicion of motor vehicle theft" when he stopped defendant based on his earlier observation that the key was inside the car.

Finding Callan's testimony "credible and consistent," the judge noted "[t]he suspicion that . . . [d]efendant was driving under the influence was informed" by "the officers' finding . . . [d]efendant asleep in another person's home."  The judge further found "[d]efendant's condition at the stationhouse, where he was agitated and smelled of alcohol, suggested intoxication."

---

[2]  The parties did not include their trial court briefs in their appellate appendices.  See R. 2:6-1(a)(2) (prohibiting the inclusion of trial court briefs in the appellate appendix unless the issue raised "is germane to the appeal").  We remind the parties this court does not, as a matter of course, review documents filed on the trial court's electronic filing system.

A-0409-24

Recounting defendant's statements to police after his initial arrest, the judge also found "[d]efendant appeared to intimate that he was impaired."

The motion judge also rejected defendant's contention that police did not conduct field sobriety tests after his initial arrest because they did not think he was intoxicated. The judge reasoned, at that time, "police were investigating criminal trespass, not drunk driving." Conversely, "[s]ufficient evidence arose" when Callan saw "[d]efendant's vehicle being driven away." And, as the judge noted, Callan had reason to believe defendant was driving the car because it was clear from his conversation with defendant at police headquarters "that no one was going to pick up . . . [d]efendant's car from the area where it was parked."

Nor was the judge persuaded defendant had ample time to "sober up" between his initial arrest and the motor vehicle stop. The judge found Callan's observations that defendant emitted an odor of alcohol and appeared intoxicated were made "between 10:07 p.m. and 10:12 p.m.," yet shortly thereafter "at approximately 11:03 p.m., [d]efendant began to drive his vehicle."

The judge also rejected defendant's argument that he would not have been released if the police suspected he was too intoxicated to drive. The judge found defendant's repeated assurances he would not drive gave police reason to believe him.

A-0409-24

Based on the totality of the circumstances, the judge concluded Callan had reasonable suspicion that defendant was driving under the influence. The judge therefore found the motor vehicle stop was lawful.

## II.

Our review of a trial court's decision on a suppression motion is circumscribed. See State v. Miranda, 253 N.J. 461, 474 (2023). After a testimonial hearing, we "defer to the trial court's factual findings because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We "must defer to the factual findings of the trial court on a motion to suppress so long as its findings are supported by sufficient credible evidence in the record." State v. Erazo, 254 N.J. 277, 297 (2023). Our deference includes the court's findings based on video-recorded evidence. See S.S., 229 N.J. at 374-81.

"An appellate court should not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." State v. Nelson, 237 N.J. 540, 551 (2019) (quoting Elders, 192 N.J. at 244). "The governing principle, then, is that '[a] trial court's

12

findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" Id. at 551-52 (alteration in original) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). "A trial court's legal conclusions, 'however, and the consequences that flow from established facts,' are reviewed de novo." State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

The standards governing warrantless motor vehicle stops are well settled. See, e.g., Delaware v. Prouse, 440 U.S. 648, 663 (1979); State v. Locurto, 157 N.J. 463, 470 (1997); State v. Golotta, 178 N.J. 205, 213 (2003). "A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521, 532 (2017). "[A]n investigatory stop is an exception justified only by reasonable suspicion of involvement in a crime." State v. Alessi, 240 N.J. 501, 523-24 (2020). Although the "[r]easonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest," State v. Stovall, 170 N.J. 346, 356 (2002), police must have "some minimal level of objective justification for making the stop," State v. Nishina, 175 N.J. 502, 511 (2003) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

"A determination of reasonable suspicion is fact-sensitive." State v. Pineiro, 181 N.J. 13, 22 (2004). To determine whether reasonable suspicion existed, a court must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. Nelson, 237 N.J. at 554-55. "The reasonable suspicion inquiry also considers the officers' background and training," including the officers' ability to "make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. at 555 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). Thus, when determining whether police had reasonable suspicion to conduct an investigatory motor vehicle stop, courts must conduct "a highly fact-intensive inquiry." Alessi, 240 N.J. at 521.

Having considered defendant's renewed contentions in view of these governing legal principles, we conclude they lack sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2). We affirm substantially for the reasons stated in the motion judge's well-reasoned decision. We add only the following comments.

As the judge noted, police initially arrested defendant after finding him asleep in a stranger's home, raising concerns he was intoxicated. Those suspicions were corroborated by Callan's personal observations and defendant's

14

tacit admissions. See State v. Zingis, 471 N.J. Super. 590, 602 (App. Div. 2022) (holding impairment can be proved observationally through a defendant's "slurred speech, loud and abrasive behavior, disheveled appearance, red and bloodshot eyes [or a] strong odor of alcoholic beverage on [the] breath" (quoting State v. Cyran, 363 N.J. Super. 442, 455-56 (App. Div. 2003))).

Similar to the motion judge, we are not persuaded the failure to conduct field sobriety tests or charge DWI following the first arrest demonstrates police did not suspect defendant was intoxicated. Callan's discretionary decision to confine the investigation and charges to trespass in those unique circumstances does not negate his observations suggesting defendant's intoxication at the time of his arrest.

Under the totality of the circumstances, we discern no basis to disturb the motion judge's decision, which is supported by sufficient credible evidence in the record. See Erazo, 254 N.J. at 297. Similar to the motion judge, we decline to address the State's alternative arguments. We note only it appears those arguments were raised after the testimonial hearing concluded.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

15

A-0409-24